## GEORGE C. DODGE, APPELLANT, v. JOHN M. WOOLSEY.

A stockholder in a corporation has a remedy in chancery against the directors, to prevent them from doing acts which would amount to a violation of the charter, or to prevent any misapplication of their capital or profits which might lessen the value of the shares, if the acts intended to be done amount to what is called in law a breach of trust or duty.

So also a stockholder has a remedy against individuals, in whatever character they profess to act, if the subject of complaint is an imputed violation of a corporate franchise, or the denial of a right growing out of it, for which there is not an adequate remedy at law.

Therefore, where the directors of a bank refused to take the proper measures to resist the collection of a tax, which they themselves believed to have been imposed upon them in violation of their charter, this refusal amounted to what is termed in law a breach of trust, a stockholder had a right to file a bill in chancery asking for such a remedy as the case might require.

If the stockholder be a resident of another State than that in which the bank and persons attempting to violate its charter, or commit a breach of trust or duty have their domicile, he may file his bill in the courts of the United States. He has this right under the constitution and laws of the United States.

The rights and duties of this court examined and explained, as an ultimate tribunal to determine whether laws enacted by congress, or by state legislatures or decisions of state courts are in conflict with the constitution of the United States.

Where the State of Ohio, chartered a bank in 1845, in which charter was stipulated the amount of tax which the bank should pay, in lieu of all taxes to which said company or the stockholders thereof, on account of stock owned therein, would otherwise be subject; and in 1852, the legislature passed an act levying taxes upon the bank to a greater amount and founded upon a different principle. This act is in conflict with the constitution of the United States, as impairing the obligation of a contract, and therefore void.

The fact, that the people of the State had, in 1851, adopted a new constitution, in which it was declared that taxes should be imposed upon banks in the mode which the act of 1852 purported to carry out, cannot release the State from the obligations and duties imposed upon it by the constitution of the United States.

The case of the Piqua Branch of the State Bank of Ohio v. Knoop, 16 How. 369, again affirmed.

THIS was an appeal from the circuit court of the United States for the District of Ohio.

The circumstances of the case are fully stated in the opinion of the court.

It was argued by *Mr. Spalding* and *Mr. Pugh*, for the appellant, and by *Mr. Stanberry* and *Mr. Vinton*, for the appellee.

The points made by the counsel for the appellant, in this court, were substantially the same with the reasons assigned by Dodge, in the circuit court in support of a motion to dissolve the injunction.

They were the following, namely:—

1. The complainant cannot sustain a suit in equity against the defendant, George C. Dodge; for in the event of his making distress for the tax in said bill mentioned, the complainant will have "plain, adequate, and complete remedy at law."

2. The complainant, as one of the stockholders of said Commercial Branch Bank, has no right to call the directors of said bank to account, in a court of equity, for an error of judgment in respect to any matter confided to their discretion.

3. There is no allegation in the bill that the bank or its directors refuse, by collusion with this defendant, or with other persons, to prosecute a suit, or to take other measures to prevent the collection of said tax.

4. The complainant, in the character of a stockholder, has no right to call the bank to account in a court of equity for a breach of trust, as the relation of trustee and *cestui que trust* does not exist between the corporation and its several stockholders.

5. The said Commercial Branch Bank is the creature of the laws of Ohio, and has no corporate existence in any other State. In the law, such corporation is regarded in the light of a citizen and inhabitant of the State which creates and sustains it. The Commercial Branch Bank can have no right to institute a suit in the federal court against George C. Dodge, also a citizen and inhabitant of Ohio.

6. A stockholder of the Commercial Branch Bank is one of the component parts of the corporation. He has no distinct individuality, so far as it respects the interests of the bank, that will enable him to sue a citizen of Ohio in the federal court, although he may be a citizen and inhabitant of the State of Connecticut.

7. The complainant, in his bill, does not show himself entitled to the interposition of this honorable court, sitting as a court of equity.

8 The tax law of April 13, 1852, is a valid, constitutional enactment by the general assembly of the State of Ohio.

9. It is contrary to sound public policy, that the collection of the State revenue should be arrested by the instrumentality of a writ of injunction.

In support of the first point it was alleged that the damages

which the complainant estimated that he would sustain by the tax were not more than $500, whereas the answer of Dodge, showed him to be worth $80,000. Baldwin, C. C. R. 394.

In the case of Osborn v. The United States Bank, the whole franchise of the bank was in jeopardy, so far as it respected that State, 9 Wheat. 738.

The right called in question was the right of the bank, an artificial person, but having a legal existence within the State of Ohio, of which State, Dodge, the other party was a citizen. No suit could therefore be carried on between them in the circuit court of the United States.

2d, 3d, 4th, 5th, and 6th, points. A stockholder had no right to intervene for the protection of the bank. The persons specified in the charter, and they alone, are or can be the agents of the corporation. 1 Kyd on Corporations, 13; Angell & Ames, on Corporations, 259; 8 Sergeant & Rawle, 521; 6 Sergeant & Rawle, 508.

It is definitively settled, however, by a great weight of authority, that where the charter has invested the board of directors with power to manage the concerns of the corporation, no one stockholder, nor any number of stockholders, has a right to compel these, the charter agents of the body corporate, to do any act contrary to their own judgment exercised in good faith. The Commonwealth v. The Trustees of St. Mary's Church, 6 Sergeant & Rawle, 508; Hersey v. Veazie, 24 Maine, 9; Smith v. Hurd et al. 12 Metcalf, 371; State of Louisiana v. Bank of Louisiana, 6 Louisiana, 745; Scott v. Depeyster, 1 Edward's N. Y. Chan. Rep. 513; Robinson v. Smith, 3 Paige, Chan. Rep. 222; Baylies v. Orne et al. 1 Freeman's Chan. Rep. 161; Hodges v. New England Screw Co. 1 Rhode Island, 312; The Oswego Falls Bridge Co. v. Fish et al. 1 Barbour's Chan. Rep. 547; Forbes v. Whitlock, 3 Edward's Chan. Rep. 446; Russell v. McLellan, 14 Pickering, 69; Angell & Ames on Corporations, 565, § 560; 2 How. 461; 1 Phillips, 790; 11 Georgia, 556.

This bill is a contrivance to give jurisdiction to the federal courts, where none fairly exists, and must therefore be discountenanced. 4 Dallas, 330; 1 Wash. C. C. R. 83; 5 Cranch, 87.

8. The tax law of 1852, is a valid, constitutional enactment.

When the case of the Piqua Branch Bank was decided, 16 How. 369, it was with reference to this circumstance, namely, that the law imposing the additional tax was imposed by a legislature which was sitting under the same constitution as that which granted the charter of 1845. But this case is different in this respect.

The constitution of 1802, contained in article 8, § 1, this clause.

" For the great purpose of protecting their rights and liberties, and securing their independence, they (the people,) have at all times a complete power to alter, reform, or abolish their government whenever they may deem it necessary."

And in the mode prescribed by another article they altered their constitution in 1851, so far as to require that all property employed in banking, whether by banks then existing or thereafter to be created, should always bear a burden of taxation, equal to that imposed upon the property of individuals.

Therefore, the immunity granted to the banking companies of Ohio, by the 60th section of the act of February 24, 1845, was accepted by them with a tacit understanding that its efficacy might be impaired by the sovereignty of the State, upon the reformation of the government, and the adoption of a new constitution.

In McCullough *v.* The State of Maryland, 4 Wheat. p. 404, Mr. Chief Justice Marshall says: " It has been said that the people had already surrendered all their powers to the state sovereignties, and had nothing more to give. But, surely, the question whether they may resume and modify the powers granted to government does not remain to be settled in this country."

In Terrett *v.* Taylor, 9 Cranch, 43, Mr. Justice Story says: " Upon a change of government, too, it may be admitted that such exclusive privileges attached to a private corporation as are inconsistent with the new government, may be abolished."

In Mumma *v.* Potomac Company, 8 Peters, 281, the same learned justice remarks as follows:—

" A corporation, by the very terms and nature of its political existence, is subject to dissolution by a surrender of its corporate franchises, and by a forfeiture of them for wilful misuser and non-user.

" Every creditor must be presumed to understand the nature and incidents of such a body politic, and to contract with reference to them. And it would be a doctrine new in the law, that the existence of a private contract of the corporation should force upon it a perpetuity of existence contrary to public policy, and the nature and objects of its charter."

The counsel for the appellee contended that as the tax, for 1853, amounted to nine per cent. upon the capital of the bank, the case was brought within Osborn *v.* United States Bank, 9 Wheat. 738; that there was danger of irreparable mischief to the franchise, and a necessity for protecting the moneys, and *choses in action* of the bank from sale, and alienation under the tax proceedings.

In the two cases cited on the other side, namely, 3 Ohio,

Dodge v. Woolsey.

370, and the Mechanics' and Traders' Bank v. Debolt, the amount of tax would not have been destructive.

The next point is as to the right of the plaintiff to bring this bill.

He sues in the character of a stockholder, and makes the bank and the directors parties defendant. The case which he makes is, that an act is threatened to be done by Dodge, the tax collector, in violation of law, which, if not prevented, will result in irreparable mischief to the corporation, and to his interest as a stockholder; and that the directors of the bank refuse to take any step to prevent the threatened injury. It further appears, that although the directors have protested against the doing of the act as a violation of the charter of the bank, yet they did suffer the distraint to be made for the tax of 1852, and took no step to prevent the distraint for the tax of 1853, which was impending when the bill was filed. It appears that there was no time for delay; for the distraint was to be made on the 21st of December, and the injunction was not applied for until the day previous.

We claim that, under such circumstances, a stockholder has a clear right to intervene. 11 Georgia, 569; 3 Paige, 233; 1 Freeman, 173; 4 Russ. 575; Hodges v. New England Screw Co. 1 R. I. 312; 7 Ohio, Pt. 1, 218; 16 How. 288; Angell & Ames, on Corp. § 312.

Upon the other branch of the case, the counsel contended that the case of Piqua Branch Bank v. Knoop, 16 How. 369, decided that the 60th section of the charter was a contract, and therefore it was no longer an open question. The ground assumed by the other side, namely, that the adoption of a new constitution in 1851, gave validity to the act of 1852, cannot be sustained.

1. Because the constitution of every State must be made in subordination to the constitution of the United States; and that in this respect, the constitution of a State in no way differs from any other law, and such constitution can no more direct the legislature to pass a law impairing the obligation of a contract, than it can direct or authorize the State to make treaties, alliances, confederations, coin money, or to do any other of those acts which are prohibited to the States by the same clause where the one now in question is found.

2. Because the power to make treaties, alliances, confederations, coin money, pass ex post facto laws and laws impairing the obligation of contracts, &c., was surrendered by the States, and is no longer possessed by the people or by the legislatures of the States, and they cannot resume or exercise the power thus surrendered, by means of a State constitution, or in any other way short of an amendment of the constitution of the United States.

3. Because, if this can be done, it not only annuls section 10 of the 1st article, but also that clause of article 6 of the constitution of the United States which declares that said constitution shall be the supreme law of the land; for if such State constitution be valid, it must put aside and override the constitution of the United States.

4. Because, thereby the constitution of the United States would virtually become in each State what the people of such State might choose to make it, without the consent of the States of the Union.

In the case of Briscoe *v.* Bank of Kentucky, 11 Pet. 257, the court say, a State cannot do that which the federal constitution declares it shall not do.

And it has even been held, that the stipulations of a treaty between the United States and a foreign nation are paramount to the provisions of the constitution of a particular State of the confederacy. Gordon *v.* Kerr, 1 Wash. Circuit Ct. Rep. 322.

Mr. Justice WAYNE delivered the opinion of the court.

It must often happen, under such a government as that of the United States, that constitutional questions will be brought to this court for decision, demanding extended investigation and its most careful judgment.

This is one of that kind; but fortunately it involves no new principles, nor any assertion of judicial action which has not been repeatedly declared to be within the constitutional and legislative jurisdiction of the courts of the United States, and by way of appeal or by writ of error, as the case may be, within that of the supreme court.

It is a suit in chancery, which was brought by John M. Woolsey, in the circuit court of the United States for the district of Ohio, seeking to enjoin the collection of a tax assessed by the State of Ohio on the Commercial Branch Bank of Cleveland, a branch of the State Bank of Ohio. He makes George C. Dodge, the tax collector, the directors of the bank, and the bank itself, defendants.

Woolsey avers that he is a citizen of the State of Connecticut, that he is the owner of thirty shares in the Branch Bank of Cleveland, that Dodge and the other defendants are all citizens of the State of Ohio, and that the Commercial Bank of Cleveland, is a corporation, and was made such, as a branch of the State Bank of Ohio, by an act of the general assembly of that State, passed the 24th of February, 1845, entitled "An act to incorporate the State Bank of Ohio and other banking companies." He alleges that the Commercial Bank has in all things complied with the requirements of its charter, and that, by the

Dodge v. Woolsey.

60th section of the act, it is declared that each banking company organized under it and complying with its provisions, shall, semi-annually, on the 1st of May and 1st of November of each year, those being the days for declaring dividends, set off to the State of Ohio six per cent. on the profits, deducting therefrom the expenses and ascertained losses of the company, for six months next preceding each dividend day; and that the sums so set off shall be in lieu of all taxes to which said company, or the stockholders thereof, on account of stock owned therein, would otherwise be subject; and that the cashier of such company shall, within ten days thereafter, inform the auditor of the State of Ohio of the amount set off, and shall pay the same to the treasurer of the State on the order of the auditor.

It is averred that the Bank of Cleveland had at all times complied with the requirements of the act. That, in the year 1853, it set off to the State six per cent. on the two semi-annual dividends which had been made in that year, on the first day of May and the first day of November, which amounted in the aggregate to the sum of $3,206$\frac{65}{100}$. That the same had been notified to the auditor, and that the bank had always been ready to pay the same when demanded. The complainant then avers, that three years before bringing his suit, having full confidence that the State of Ohio would observe good faith towards the bank, in respect to its franchises and privileges conferred upon it by the act of incorporation, and that it would adhere with fidelity to the rule of taxation provided for in the charter, he had purchased thirty shares of the capital stock of the bank, and that he was then the owner of the same. He further states, after he had made such purchases, that on the 17th of June, 1851, a draft of a new constitution had been submitted to the electors of the State for their acceptance or rejection, which, if accepted by a majority of the electors who should vote, was to take effect as the constitution of the State, on the 1st of September, 1851. It is admitted that it was accepted, that it became and now is the constitution of the State of Ohio. It is provided in sections two and three of the 12th article of that constitution, that laws shall be passed, taxing by an uniform rule, all moneys, credits, investments in bonds, stock, joint-stock companies, or otherwise; and that the general assembly shall provide by law for taxing the notes and bills discounted or purchased, money loaned, and all other property, effects, or dues whatever, without deduction, of all banks now existing, or hereafter created, and of all bankers, so that all property employed in banking shall always bear a burden of taxation equal to that imposed on the property of individuals. And in the 4th section of the 13th article of the constitution of 1851, it is further de-

clared, that the property of corporations now existing, or here-after created, shall be subject to taxation, as the property of individuals.

It appears also by the bill, that the general assembly of the State of Ohio passed an act on the 13th of April, 1852, for the assessment and taxation of all property in the State, and for levying taxes on the same according to its true value in money, in which it is declared to be the duty of the president and cashier of every bank, or banking company, "that shall have been, or may hereafter be, incorporated by the laws of the State, and having the right to issue bills for circulation as money, to make and return, under oath, to the auditor of the county in which such banks may be, in the month of May, annually, a written statement containing, first, the average amount of notes and bills discounted or purchased, which amount shall include all the loans or discounts, whether originally made, or renewed during the year, or at any time previous; whether made on bills of exchange, notes, bonds, mortgages, or other evidence of in-debtedness, at their actual cost value in money; whether due previous to, during, or after the period aforesaid, and on which said banking company has, at any time, recovered or received, or is entitled to receive, any profit or other consideration what-ever, either in the shape of interest, discount, exchange, or other-wise; and secondly, the average amount of all other moneys, effects, or dues of every description, belonging to such bank, or banking company, loaned, invested, or otherwise used or em-ployed, with a view to profit, or upon which such bank, or banking company receives, or is entitled to receive, interest.

The act then makes it the duty of the auditors, in the counties in which a bank or banking companies may be, to receive from them returns of notes and bills discounted, and all other moneys and effects or dues, as provided for in the 19th section of the act, to enter the same for taxation upon the grand duplicate of the property of the county, and upon the city duplicate for city taxes, in cases where the city tax is not returned upon the grand duplicate, but is collected by city officers; which amounts so returned and entered shall be taxed for the same purposes and to the same extent that personal property is, or may be taxed, in the place where such bank or banking company is situated. It is then averred that the president and cashier of the Com-mercial Bank of Cleveland, fearing the penalty imposed by the act for a refusal or neglect to make a return according to the act, did, in the month of May, in the year 1852, make a return, protesting against the right of the State to assess a tax upon the bank, other than that which was provided for, in the charter of its incorporation of the 24th February, 1845. But it appears

that the return so coerced from the president and directors of the bank had been assessed by the auditor, for the tax of 1852, at $10,197$\frac{55}{100}$, exceeding by $7,526$\frac{72}{100}$ the amount of tax for which the bank was liable under its charter, which George C. Dodge, as collector of taxes, seized and collected by distress on its moneys. It is also shown by the bill, that there has been another entry of taxation against the bank for the year 1853, of $14,771$\frac{87}{100}$, exceeding the sum to which it is liable under its charter by $11,665$\frac{22}{100}$ for that year.

It is against the collection of this tax that John M. Woolsey, as a stockholder in the bank, has brought this suit, claiming an exemption from it as a stockholder, upon the ground that the act of the general assembly of the State of Ohio, and the tax assessed under it upon the bank, are in violation of the 10th section of the 1st article of the constitution of the United States, which declares that no State shall pass any law impairing the obligation of contracts. And he seeks the aid of the circuit court to enjoin Dodge, the defendant, from collecting the same from the bank, as collector of taxes, as he had threatened to do by distress, and as he had done for the assessed tax for the year 1852.

The complainant gives a further aspect to his suit which it is also proper to notice. It is, if the taxes are permitted to be assessed and collected from the bank, under the act of the 13th of April, 1852, it will virtually destroy and annul the contract between the State and the bank, in respect to the tax which the State imposed upon it by the charter of its incorporation, in lieu of all other taxes upon the bank or the stockholders thereof, on account of stock owned therein; that his stock will be thereby lessened in value, his dividends diminished; and that the tax is so onerous upon the bank, that it will compel a suspension and final cessation of its business. He finally declares that as a stockholder, on his own behalf, he had requested the directors of the bank to take measures, by suit or otherwise, to assert the franchises of the bank against the collection of what he believes to be an unconstitutional tax, and that they had refused to do so.

To this bill the defendant, George C. Dodge, filed an answer. The other defendants did not answer. He admits the material allegations of the bill, except the allegation that the tax law of April 13, 1852, is unconstitutional; says that the act is in conformity with the constitution of Ohio, which took effect September 1, 1851, and that it is in harmony with the constitution of the United States. He denies that any application was made by Woolsey to the directors of the bank, to take measures, by suit or otherwise, to prevent the collection of the tax, and

insists that this averment was inserted merely for the purpose of giving color to a proceeding in chancery. That the complainant would not have sustained an irreparable injury even if he had, as treasurer, proceeded to distrain for the tax; for that the bank would have had a remedy at law against him for all damages which might have been sustained in consequence of such distress, as he is worth, at a reasonable estimate, eighty thousand dollars after the payment of all his debts. And he insists that the complainant had not exhibited such a case as entitled him to the interposition of a court of equity. To this answer a general replication was filed. But it was agreed by the counsel in the cause, that the complainant had, by his attorney, addressed a letter to the Commercial Bank of Cleveland, to institute proper proceedings to prevent the collection of the tax by Dodge, in the same manner as had been done by the attorney of a stockholder in the Canal Bank of Cleveland, for a tax assessed upon it under the same act, and that the action of the board of the Commercial Bank, in answer to Woolsey's application, was the same as had been given by the directors of the Canal Bank. That resolution was in these words:. " Resolved, that we fully concur in the views expressed in said letter as to the illegality of the tax therein named, and believe it to be in no way binding upon the bank; but, in consideration of the many obstacles in the way of testing the law in the courts of the State, we cannot consent to take the action which we are called upon to take, but must leave the said Kleman to pursue such measures as he may deem best in the premises."

Upon the foregoing pleadings and admission, the circuit court rendered a final decree for the complainant, perpetually enjoining the treasurer against the collection of the tax, under the act of the 13th February, 1852, and subjecting the defendant, Dodge, to the payment of the costs of the suit. From that decision the defendant, Dodge, has appealed to this court.

His counsel have relied upon the following points to sustain the appeal:—

1. The complainant does not show himself to be entitled to relief in a court of chancery, because the charter of the bank provides, that its affairs shall be managed by a board of directors, and that they are not amenable to the stockholders for an error of judgment merely. And that in order to make them so, it should have been averred that they were in collusion with the tax collector in their refusal to take legal steps to test the validity of the tax.

2. It was urged that this suit had been improperly brought in the circuit court of the United States for the district of Ohio, because it is a contrivance to create a jurisdiction, where none

fairly exists, by substituting an individual stockholder in place of the Commercial Bank as complainant, and making the directors defendants; the stockholder being made complainant, because he is a citizen of the State of Connecticut, and the directors being made defendants to give countenance to his suit.

3d. It was said, if the foregoing points were not available to defeat the action, that it might be contended that the defendant was in the discharge of his official duty when interrupted by the mandate of the circuit court, and that the tax had been properly assessed by a law of the State, in conformity with its constitution, of the 1st September, 1851.

We will consider the points in their order. The first comprehends two propositions, namely; that courts of equity have no jurisdiction over corporations, as such, at the suit of a stockholder for violations of charters, and none for the errors of judgment of those who manage their business ordinarily.

There has been a conflict of judicial authority in both. Still, it has been found necessary, for prevention of injuries for which common-law courts were inadequate, to entertain in equity such a jurisdiction in the progressive development of the powers and effects of private corporations upon all the business and interests of society.

It is now no longer doubted, either in England or the United States, that courts of equity, in both, have a jurisdiction over corporations, at the instance of one or more of their members; to apply preventive remedies by injunction, to restrain those who administer them from doing acts which would amount to a violation of charters, or to prevent any misapplication of their capitals or profits, which might result in lessening the dividends of stockholders, or the value of their shares, as either may be protected by the franchises of a corporation, if the acts intended to be done create what is in the law denominated a breach of trust. And the jurisdiction extends to inquire into, and to enjoin, as the case may require that to be done, any proceedings by individuals, in whatever character they may profess to act, if the subject of complaint is an imputed violation of a corporate franchise, or the denial of a right growing out of it, for which there is not an adequate remedy at law. 2 Russ. & Mylne Ch. R., Cunliffe v. Manchester and Bolton Canal Company, 480, n.; Ware v. Grand Junction Water Company, 2 Russ. & Mylne, 470; Bagshaw v. Eastern Counties Railway Company, 7 Hare Ch. R. 114; Angell & Ames, 4th ed. 424, and the other cases there cited.

It was ruled in the case of Cunliffe v. The Manchester and Bolton Canal Company, 2 Russ. & Mylne Ch. R. 481, that where the legal remedy against a corporation is inadequate, a

Dodge v. Woolsey.

court of equity will interfere, and that there were cases in which a bill in equity will lie against a corporation by one of its members. "It is a breach of trust towards a shareholder in a joint-stock incorporated company, established for certain definite purposes prescribed by its character, if the funds or credit of the company are, without his consent, diverted from such purpose, though the misapplication be sanctioned by the votes of a majority; and, therefore, he may file a bill in equity against the company in his own behalf, to restrain the company by injunction from any such diversion or misapplication. In the case of Ware v. Grand Junction Water Company, 2 Russell & Mylne, a bill filed by a member of the company against it, Lord Brougham said: "It is said this is an attempt on the part of the company to do acts which they are not empowered to do by the acts of parliament," meaning the charter of the company; "so far I restrain them by injunction." "Indeed, an investment in the stock of a corporation must, by every one, be considered a wild speculation, if it exposed the owners of the stock to all sorts of risk in support of plausible projects not set forth and authorized by the act of incorporation, and which may possibly lead to extraordinary losses. The same jurisdiction was invoked and applied in the case of Bagshaw v. The Eastern Counties Railway Company; so, also, in Coleman v. The same company, 10 Beavan's Ch. Reports, 1. It appeared in that case that the directors of the company, for the purpose of increasing their traffic, proposed to guarantee certain profits, and to secure the capital of an intended steam-packet company, which was to act in connection with the railway. It was held, such a transaction was not within the scope of their powers, and they were restrained by injunction. And in the second place, that in such a case one of the shareholders in the railway company was entitled to sue in behalf of himself and all the other shareholders, except the directors, who were defendants, although some of the shareholders had taken shares in the steam-packet company. It was contended in this case that the corporation might pledge, without limit, the funds of the company for the encouragement of other transactions, however various and extensive, provided the object of that liability was to increase the traffic upon the railway, and thereby increase the traffic to the shareholders. But the master of the rolls, Lord Langdale, said, "there was no authority for any thing of that kind."

But further, it is not only illegal for a corporation to apply its capital to objects not contemplated by its charter, but also to apply its profits. And therefore a shareholder may maintain a bill in equity against the directors and compel the company to refund any of the profits thus improperly applied. It is an im-

proper application for a railway company to invest the profits of the company in the purchase of shares in another company. The dividend (says Lord Langdale, in Solamons v. Laing, 14 Jurist for December, 1850,) which belongs to the shareholders, and is divisible among them, may be applied severally as their own property; but the company itself or the directors, or any number of shareholders, at a meeting or otherwise, have no right to dispose of his shares of the general dividends, which belong to the particular shareholder, in any manner contrary to the will, or without the consent or authority of, that particular shareholder.

We do not mean to say that the jurisdiction in equity over corporations at the suit of a shareholder has not been contested. The cases cited in this argument show it to have been otherwise; but when the case of Hodges·v. The New England Screw Company et al. was cited against it—(we may say the best argued and judicially considered case which we know upon the point, both upon the original hearing and rehearing of that cause,)—the counsel could not have been aware of the fact that, upon the rehearing of it, the learned court, which had decided that courts of equity have no jurisdiction over corporations as such at the suit of a stockholder for violations of charter, reviewed and recalled that conclusion. The language of the court is: "We have thought it our duty to review in this general form this new and unsettled jurisdiction, and to say, in view of the novelty and importance of the subject, and the additional light which has been thrown upon it since the trial, we consider the jurisdiction of this court over corporations for breaches of charter, at the suit of shareholders, and how far it shall be extended, and subject to what limits, is still an open question in this court. 1 Rhode Island Reports, 312—rehearing of the case September term, 1853."

The result of the cases is well stated in Angell & Ames, paragraphs 391, 393. "In cases where the legal remedy against a corporation is inadequate, a court of equity will interfere, is well settled, and there are cases in which a bill in equity will lie against a corporation by one of its members." "Though the result of the authorities clearly is, that in a corporation, when acting within the scope of and in obedience to the provisions of its constitution, the will of the majority, duly expressed at a legally constituted meeting, must govern; yet beyond the limits of the act of incorporation, the will of the majority cannot make an act valid; and the powers of a court of equity may be put in motion at the instance of a single shareholder, if he can show that the corporation are employing their statutory powers for the accomplishment of purposes not within the scope of their institution. Yet it is to be observed, that there is an important

distinction between this class of cases and those in which there is no breach of trust, but only error and misapprehension, or simple negligence on the part of the directors." *

We have then the rule and its limitation. It is contended that this case is within the limitation; or that the directors of the Commercial Bank of Cleveland, in their action in respect to the tax assessed upon it, under the act of April 18, 1852, and in their refusal to take proper measures for testing its validity, have committed an "error of judgment merely."

It is obvious, from the rule, that the circumstances of each case must determine the jurisdiction of a court of equity to give the relief sought. That the pleadings must be relied upon to collect what they are, to ascertain in what character, and to what end a shareholder invokes the interposition of a court of equity, on account of the mismanagement of a board of directors. Whether such acts are out of or beyond the limits of the act of incorporation, either of commission contrary thereto, or of negligence in not doing what it may be their chartered duty to do.

This brings us to the inquiry, as to what the directors have done in this case, and what they refused to do upon the application of their co-corporator, John M. Woolsey. After a full statement of his case, comprehending all of his rights and theirs also, alleging in his bill that his object was to test the validity of a tax upon the ground that it was unconstitutional, because it impaired the obligation of a contract made by the State of Ohio

---

* So it has been repeatedly decided, that a private corporation may be sued at law by one of its own members. The text upon this subject is so well expressed, with authorities to support it, that we will extract the paragraph 390 from Angell & Ames entire. A private corporation may be sued by one of its own members. This point came directly before the court, in the State of South Carolina in an action of assumpsit against the Catawba Company. The plea in abatement was, that the plaintiff himself was a member of that company, and therefore could maintain no action against it in his individual capacity. The court, after hearing argument, overruled the plea as containing principles subversive of justice; and they moreover said, that the point had been settled by two former cases, wherein certain officers were allowed to maintain actions for their salaries due by the company. In this respect, the cases of incorporated companies are entirely dissimilar from those of ordinary copartnerships, or unincorporated joint-stock companies. In the former, the individual members of the company are entirely distinct from the artificial body endowed with corporate powers. A member of a corporation who is a creditor, has the same right as any other creditor to secure the payment of his demands, by attachment or by levy upon the property of the corporation, although he may be personally liable by statute to satisfy other judgments against the corporation. An action was maintained against a corporation on a bond securing a certain sum to the plaintiff, a member of the corporation, the member being deemed by the court à stranger. Pierce & Partridge, 3 Met. Mass. 44; so of notes and bonds, accounts and rights to dividends. Hill *v.* Manchester and Salford Water-works, 5 Adol. & Ellis, 866; Dunston *v.* Imperial Glass Company, 3 B. & Adol. 125; Geer *v.* School District, 6 Vermont, 187; Methodist Episcopal Society, 18 Ib. 405; Rogers *v.* Danby Universalist Society, 19 Ib. 187.

with the Commercial Bank of Cleveland, and the stockholders thereof; he represents in his own behalf, as a stockholder, that he had applied to the directors, requesting them to take measures, by suit or otherwise, to prevent the collection of the tax by the treasurer, and that they refused to do so, accompanying, however, their refusal with the declaration that they fully concurred with Woolsey in his views as to the illegality of the tax; that they believed it in no way binding upon the bank, but that, in consideration of the many obstacles in the way of resisting the collection of the tax in the courts of the State, they could not consent to take legal measures for testing it. Besides this refusal, the papers in the case disclose the fact that, the directors had previously made two protests against the constitutionality of the tax, because it was repugnant to the constitution of the United States, and to that of Ohio also, both concluding with a resolution that they would not, as then advised, pay the tax, unless compelled by law to do so, and that they were determined to rely upon the constitutional and legal rights of the bank under its charter. Now, in our view, the refusal upon the part of the directors, by their own showing, partakes more of disregard of duty, than of an error of judgment. It was a non-performance of a confessed official obligation, amounting to what the law considers a breach of trust, though it may not involve intentional moral delinquency. It was a mistake, it is true, of what their duty required from them, according to their own sense of it, but, being a duty by their own confession, their refusal was an act outside of the obligation which the charter imposed upon them to protect what they conscientiously believed to be the franchises of the bank. A sense of duty and conduct contrary to it, is not " an error of judgment merely," and cannot be so called in any case. It amounted to an illegal application of the profits due to the stockholders of the bank, into which a court of equity will inquire to prevent its being made.

Thinking, as we do, that the action of the board of directors was not " an error of judgment merely " but a breach of duty, it is our opinion that they were properly made parties to the bill. and that the jurisdiction of a court of equity reaches such a case to give such a remedy as its circumstances may require. This conclusion makes it unnecessary for us to notice further the point made by the counsel that the suit should have been brought in the name of the corporation, in support of which they cited the case of the Bank of the United States v. Osborn. The obvious difference between this case and that is, that the Bank of the United States brought a bill in the circuit court of the United States for the district of Ohio, to resist a tax assessed under an act of that State, and executed by its auditor, and here the

directors of the Commercial Bank of Cleveland, by refusing to do what they had declared it to be their duty to do, have forced one of its corporators, in self-defence, to sue. If the directors had done so in a state court of Ohio, and put their case upon the uncon titutionality of the tax act, because it impaired the obligation of a contract, and had the decision been against such claim, the judgment of the state court could have been reëxamined, in that particular, in the supreme court of the United States, under the same authority or jurisdiction by which it reversed the judgment of the supreme court of Ohio, in the case of the Piqua Branch of the State Bank of Ohio v. Jacob Knoop, treasurer of Miami county, 16 How. 369.

But it was said in the argument, that this suit had been improperly brought in the circuit court of the United States, because it was a contrivance by Woolsey, or between him and the directors of the bank, to give that court jurisdiction, on account of their residence and citizenship being in different States. That the subject-matter of the suit was within the exclusive jurisdiction of the state courts, and that, if the jurisdiction in the courts of the United States was sustained, it would make inoperative to a great extent the 7th amendment of the constitution of the United States and the 16th section of the Judiciary Act of 1789, this last being a declaratory act, settling the law, as to cases of equity jurisdiction, in the nature of a proviso, limitation, or exception to its exercise. And further, that it would make the judiciary of the United States paramount to that of the individual States, and the legislative and executive departments of the federal government paramount to the same departments of the individual States.

We first remark as to the imputation of contrivance, that it is the assertion of a fact which does not appear in the case, one which the defendants should have proved if they meant to rely upon it to abate or defeat the complainant's suit, and that, not having done so, as they might have attempted to do, we cannot presume its existence. Mr. Woolsey's right, as a citizen of the State of Connecticut, to sue citizens of the State of Ohio in the courts of the United States, for that State, cannot be questioned. The papers in the case also show, that the directors and himself occupy antagonist grounds in respect to the controversy which their refusal to sue forced him to take in defence of his rights as a shareholder in the bank. Nor can the counsel for the defendant assume the existence of such a fact in the argument of their case in this court, in the absence of any attempt on their part to prove it in the circuit court.

We remark, as to the subject-matter of the suit being within the exclusive jurisdiction of the state courts, that the courts of

the United States and the courts of the States have concurrent jurisdiction in all cases between citizens of different States, whatever may be the matter in controversy, if it be one for judicial cognizance. Such is the constitution of the United States, and the legislation to congress " in pursuance thereof." And when it was urged that the jurisdiction of the case belonged exclusively to the state courts of Ohio, under the 7th article of the amendments to the constitution, and the 16th section of the judiciary act of 1789 was invoked to sustain the position, it seems it was forgotten that this court and other courts of the United States had repeatedly decided that the equity jurisdiction of the courts of the United States is independent of the local law of any State, and is the same in nature and extent as the equity jurisdiction of England, from which it is derived, and that it is no objection to this jurisdiction, that there is a remedy under the local law. Gordon v. Hobart, 2 Sumner, C. C. Rep. 401.

It was also said by both of the counsel for the defendant, and argued with some zeal, that if the court sustained the jurisdiction in this case, it would be difficult to determine whether any thing, and how much of state sovereignty may hereafter exist. We shall give to this observation our particular consideration, regretting that it should be necessary, but not doubting that such a jurisdiction exists at the suit of a shareholder, and that the appellate jurisdiction of this court may be exercised in the matter, not only without taking away any of the rights of the States, but, by doing so, giving additional securities for their preservation, to the great benefit of the people of the United States. If it does not exist and was not exercised, we should indeed have a very imperfect national government, altogether unworthy of the wisdom and foresight of those who framed it; incompetent, too, to secure for the future those advantages hitherto secured by it to the people of the United States, and which were in their contemplation, when, by their conventions in the several States, the constitution was ratified.

Impelled then by a sense of duty to the constitution, and the administration of so much of it as has been assigned to the judiciary, we proceed with the discussion.

The departments of the government are legislative, executive, and judicial. They are coördinate in degree to the extent of the powers delegated to each of them. Each, in the exercise of its powers, is independent of the other, but all, rightfully done by either, is binding upon the others. The constitution is supreme over all of them, because the people who ratified it have made it so; consequently, any thing which may be done unauthorized by it is unlawful. But it is not only over the departments of

the government that the constitution is supreme. It is so, to the extent of its delegated powers, over all who made themselves parties to it; States as well as persons, within those concessions of sovereign powers yielded by the people of the States, when they accepted the constitution in their conventions. Nor does its supremacy end there. It is supreme over the people of the United States, aggregately and in their separate sovereignties, because they have excluded themselves from any direct or immediate agency in making amendments to it, and have directed that amendments should be made representatively for them, by the congress of the United States, when two thirds of both houses shall propose them; or where the legislatures of two thirds of the several States shall call a convention for proposing amendments, which, in either case, become valid, to all intents and purposes, as a part of the constitution, when ratified by the legislatures of three fourths of the several States, or by conventions in three fourths of them, as one or the other mode of ratification may be proposed by congress. The same article declares that no amendment, which might be made prior to the year 1808, should, in any manner, affect the first and fourth clauses in the ninth section of the first article, and that no State, without its consent, shall be deprived of its equal suffrage in the senate. The first being a temporary disability to amend, and the other two permanent and unalterable exceptions to the power of amendment.

Now, whether such a supremacy of the constitution, with its limitations in the particulars just mentioned, and with the further restriction laid by the people upon themselves, and for themselves, as to the modes of amendment, be right or wrong politically, no one can deny that the constitution is supreme, as has been stated, and that the statement is in exact conformity with it.

Further, the constitution is not only supreme in the sense we have said it was, for the people in the ratification of it have chosen to add that "this constitution and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges in every State shall be bound thereby, any thing in the constitution or laws of any State to the contrary notwithstanding." And, in that connection, to make its supremacy more complete, impressive, and practical, that there should be no escape from its operation, and that its binding force upon the States and the members of congress should be unmistakable, it is declared that "the senators and representatives, before mentioned, and the members of the state legislatures, and all executive and judicial officers, both of the United States and of

the several States, shall be bound by an oath or affirmation to support this constitution.

Having stated, not by way of argument or inference, but in the words of the constitution, the particulars in which it is declared to be supreme, we proceed to show that it contains an interpreter, or has given directions for determining what is its meaning and operation, what "laws are made in pursuance thereof," and to fix the meaning of treaties which had been made, or which shall be made, under the authority of the United States, when either the constitution, the laws of congress, or a treaty, are brought judicially in question, in which a State, or a citizen of the United States, or a foreigner, shall claim rights before the courts of the United States, or in the courts of the States, either under the constitution or the laws of the United States, or from a treaty.

All legislative powers in the constitution are vested in a congress of the United States, which shall consist of a senate and house of representatives. Then stating of whom the house shall be composed, how they shall be chosen by the people of the several States, the qualification of electors, the age of representatives, the time of their citizenship, and their inhabitancy in the State in which they shall be chosen ; how representatives and direct taxes shall be apportioned, how the senate shall be composed, with sundry other provisions relating to the house and the senate, the powers of congress are enumerated affirmatively. The 9th section then declares what the congress shall not have power to do, and it is followed by the 10th, consisting of three paragraphs, all of them prohibitions upon the States from doing the particulars expressed in them.

Our first suggestion now is, as all the legislative powers are concessions of sovereignty from the people of the States, and the prohibitions upon them in the 10th section are likewise so, both raise an obligation upon the States not to legislate upon either ; each, however, conferring rights, according to what may be the constitutional legislation of congress upon the first ; and the second giving rights of equal force, without legislation in respect to such of them as execute themselves, on account of their being 'prohibitions of what the States shall not do. For instance, no legislation by congress is wanted to make more binding upon the States what they have bound themselves in absolute terms not to do. As where it is said "no State shall enter into any treaty, alliance, or confederation, grant letters of marque and reprisal, coin money, emit bills of credit, make any thing but gold and silver coin a tender in payment of debts, pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts, or grant any title of nobility."

Our next suggestion is, that the grants of legislative powers, and the negation of the exercise of other powers by the States, some of them being declarations that they would not legislate upon those matters which had been exclusively given up for the legislation of congress, do not imply that the States would be wilfully disregardful of the obligations solemnly placed upon them by their people; but that there might be interferences from their legislation in some of those particulars, either with the constitution, or between their enactments and those of congress. But this apprehension (not without cause) was founded upon the legislation of some of the States during the continuance of the articles of confederation, affecting the rights and interests of persons in their contracts, from which they could get no relief, unless it was granted by the same State legislatures which passed the acts. This suggested the necessity, or rather made it obvious, that our national union would be incomplete and altogether insufficient for the great ends contemplated, unless a constitutional arbiter was provided to give certainty and uniformity, in all of the States, to the interpretation of the constitution and the legislation of congress; with powers also to declare judicially what acts of the legislatures of the States might be in conflict with either. Had this not been done, there would have been no mutuality of constitutional obligation between the States, either in respect to the constitution or the laws of congress, and each of them would have determined for itself the operation of both, either by legislation or judicial action. In either way, exempting itself and its citizens from engagements which it had not made by itself, but in common with other States of the union, equally sovereign; by which they bound their sovereignties to each other, that neither of them should assume to settle a principle or interest for itself, in a matter which was the common interest of all of them. Such is certainly the common sense view of the people, when any number of them enter into a contract for their mutual benefit, in the same proportions of interest. In such a case, neither should assume the right to bind his compeers by his judgment, as to the stipulations of their contract. If one of them did so, any other of them might call in the aid of the law to settle their differences, and its judgment would terminate the controversy. It must not be said that the illustration is inappropriate, because individuals have no other mode to settle their disputes, and that States and nations, from their equal sovereignty, have no tribunal to terminate authoritatively their differences, each having the right to judge and do so for itself.

But ours is not such a government. The States, or rather the people forming it, though sovereign as to the powers not delegated

to the United States by the constitution, nor prohibited by it to the States, are not independent of each other, in respect to the powers ceded in the constitution.

Their union, by the constitution, was made by each of them conceding portions of their equal sovereignties for all of them, and it acts upon the States conjunctively and separately, and in the same manner upon their citizens, aggregately in some things, and in others individually, in many of their relations of business, and also upon their civil conduct, so far as their obedience to the laws of congress is concerned.

In such a union, the States are bound by all of those principles of justice which bind individuals to their contracts. They are bound by their mutual acquiescence in the powers of the constitution, that neither of them should be the judge, or should be allowed to be the final judge of the powers of the constitution, or of the interpretation of the laws of congress. This is not so, because their sovereignty is impaired; but the exercise of it is diminished in quantity, because they have, in certain respects, put restraints upon that exercise, in virtue of voluntary engagements. (Vattel, Ch. 1, section 10.)

We will now give two illustrations—one from the constitution, and the other from one of the cases decided in this court, upon a tax act of the State of Ohio—to show that the framers of the constitution, and the conventions which ratified it, were fully aware of the necessity for and meant to make a department of it, to which was to be confided the final decision judicially of the powers of that instrument, the conformity of laws with it, which either congress or the legislatures of the States may enact, and to review the judgments of the state courts, in which a right is decided against, which has been claimed in virtue of the constitution or the laws of congress.

The third clause of the 2d section of the 1st article of the constitution is, "that representatives and direct taxes shall be apportioned among the several States, according to their respective numbers, which shall be determined by adding to the whole number of free persons, including those bound to service for a term of years, and excluding Indians not taxed, three fifths of all other persons." We will suppose that congress shall again impose a direct tax, and that a citizen liable to assessment should dispute its application to a kind of his property, alleging it not to be a direct tax, in the sense of that provision of the constitution; and that he should apply to a state court for relief from an execution which had been levied upon his property for its collection, making the United States collector of the tax a party to his suit; and that the court should enjoin him from further proceedings to collect the tax. It is plain, if such a judgment was final,

and could not be reviewed by any other court, or by the supreme court of the United States, in virtue of its appellate jurisdiction, as that has been given by the act of congress, the result would be, that the citizens of the State in which the judgment was given, would be exempted from the payment of a tax which had been intended by congress to be apportioned upon the property of all of the citizens of the United States, in conformity with the constitution.   This would practically defeat the rule of apportionment if it was acquiesced in by the government of the United States, and the constitutional collection of the tax could not be made in any State according to the act.   We do not mean that the officers of the United States could not collect the tax in those States in which no such judgment had been given; but if the judgment could not be reviewed, that the constitutional rule for the imposition of direct taxes could not be executed by any legislation of congress which a State legislature or a state court might not say was unconstitutional.   We should not then have a more perfect union than we had under the articles of confederation.   Each State then paid the requisition of congress, when it pleased to do so.   Had it been continued, the union would be more feeble for all national purposes than it had been.   Then the States only disregarded their obligations to suit their convenience.   Had it not been corrected, as it has been done in the constitution, we have no reason to believe that there would not be like results, or that the courts of the States would not be resorted to, to determine the constitutionality of taxes laid by congress.   This was certainly not meant by the framers of the constitution, nor can its disallowance be brought under the 10th article of its amendments, which declares "that the powers not delegated to the United States by the constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

The illustration given, and its results, have been drawn from the constitution of the United States, also from what might be the action of the state legislatures and state courts, which could not be prevented unless the supreme court of the United States had the power to review the action of the state courts upon a matter exclusively of national interest, made so by the legislation of congress.

Hitherto, no such case as we have supposed has happened, but a reference to the case of Hylton *v.* The United States, 3 Dallas, 171, in which an attempt was made to test the constitutionality of a tax assessed by the United States, will show that a case of the kind is not unlikely to occur, when congress shall impose a tax apportioning representation and direct taxation; or, under the general declaration in the 8th section of the 1st article of the

Dodge *v.* Woolsey.

constitution, that "congress shall have power to lay and collect taxes, duties, imposts, and excises, but that all duties shall be uniform throughout the United States." Let it be understood, too, that the power is not only to impose duties and taxes, but to collect them, and from the power to collect must necessarily be inferred the disability of the legislatures of the States, or of the courts of the States, in any way to interfere with its execution, as that may be directed by congress. If the courts of the States, or their legislatures, could finally determine against the constitutionality of a tax laid by congress, there would be no certainty or uniformity of taxation upon the citizens of the United States, or of the apportionment of representation and direct taxation according to the constitution.

Other illustrations of the propriety and necessity for a judicial tribunal of the United States to settle such questions finally, might be made from other clauses of the constitution. We will, however, cite but one of them in addition to such as have been already mentioned. It is the power of congress to regulate commerce, and we refer to the case of Brown *v.* The State of Maryland, as an instance of the attempt of that State to lay a tax upon imports, which this court pronounced to be unconstitutional.

We will now give other illustrations, in which the rights of property are involved, to show the cautious wisdom of that provision of the constitution which secures to the citizens of the different States a right to sue in the courts of the United States, and to claim either in them, or in the courts of the States, the protection either of the constitution or of the laws of congress.

The legislature of Ohio passed an act in 1803, incorporating the proprietors of the half-million of acres of land south of Lake Erie called the "Sufferers' Land." This act required the appointment of directors, who were authorized to extinguish the Indian title, to survey the land into townships, or otherwise make partition among the owners; and, among other things provided, "that, to defray all necessary expenses of the company in purchasing and extinguishing the Indian claim of title to the land, surveying, locating, and making partition, and all other necessary expenses of said company, power is hereby vested in the said directors, and their successors in office, to levy a tax or taxes on said land, and enforce the collection thereof." It was also provided that the directors should have power and authority to do whatever it shall appear to them to be necessary and proper to be done for the well-ordering and interest of the proprietors, not contrary to the laws of the State. Subsequently, the legislature of Ohio imposed a tax upon these lands as a part of the revenue to be raised for the State. The directors assessed a tax upon

the share of each proprietor, to pay the tax to the State. A sale of a part of the land was made for that purpose, and the question subsequently raised in the circuit court of the United States for the district of Ohio, in a suit at the instance of the heirs of one of the proprietors whose land had been sold, was, whether the sale conveyed a title to the land to the purchaser. It was determined by this court, that it did not, because the directors had not power to make an assessment upon the lands to pay the state tax, and that the tax, as laid by the State, had been done in violation of the corporate powers given to the directors. In this case the plaintiffs sought protection against the tax laid by Ohio, and acquiesced in by the directors of the corporation, because that tax was contrary to the contract which the State had made with the corporation for the benefit of the proprietors of the land. The State, without being a party to the record, was interested in the question. It was a suit between citizens of different States, brought by the plaintiffs in the United States circuit court for Ohio; and the motive for seeking that tribunal was, that his rights might be tried in one not subject either to State or local influences. It placed both parties upon an equality, in fact and in appearances; and whatever might have been the result, neither could complain of the disinterestedness of the court which adjudged their rights. Beatty v. The Lessee of Knowles, 4 Peters, 152.

The foundation of the right of citizens of different States to sue each other in the courts of the United States, is not an unworthy jealousy of the impartiality of the state tribunals. It has a higher aim and purpose. It is to make the people think and feel, though residing in different States of the Union, that their relations to each other were protected by the strictest justice, administered in courts independent of all local control or connection with the subject-matter of the controversy between the parties to a suit.

Men unite in civil society, expecting to enjoy peaceably what belongs to them, and that they may regain it by the law when wrongfully withheld. That can only be accomplished by good laws, with suitable provisions for the establishment of courts of justice, and for the enforcement of their decisions. The right to establish them flows from the same source which determines the extent of the legislative and executive powers of government. Experience has shown that the object cannot be attained without a supreme tribunal, as one of the departments of the government, with defined powers in its organic structure, and the mode for exercising them to be provided legislatively. This has been done in the constitution of the United States. Its framers were well aware of their responsibilities to secure justice to the people;

and well knew, as the object of all trials in courts was to deter-
mine the suits between citizens, that it could not be done satis-
factorily to them, unless they had the privilege to appeal from
the first tribunal which had jurisdiction of a suit to another
which should have authority to pronounce definitively upon its
merits. (Vattel, 9th chapter, on justice and polity.) Without
such a court the citizens of each State could not have enjoyed
all the privileges and immunities of citizens in the several States,
as they were intended to be secured by the second section of the
4th article of the constitution. Nor would the judicial power
have been extended in fact to " all cases in law and equity aris-
ing under the constitution, the laws of the United States, and
treaties made or which shall be made under their authority, to
all cases affecting ambassadors and other public ministers and
consuls; to all cases of admiralty and maritime jurisdiction; to
controversies to which the United States shall be a party; to
controversies between two or more States ; to those between
citizens of different States, or between citizens of the same State,
claiming lands under grants of different States; and between a
State and the citizens thereof and foreign States, citizens or
subjects." Article 3d, section 1st.

Without the supreme court, as it has been constitutionally and
legislatively constituted, neither the constitution nor the laws of
congress passed in pursuance of it, nor treaties, would be in
practice or in fact the supreme law of the land, and the injunc-
tion that the judges in every State should be bound thereby, any
thing in the constitution or laws of any State to the contrary
notwithstanding, would be useless, if the judges of state courts,
in any one of the States, could finally determine what was the
meaning and operation of the constitution and laws of congress,
or the extent of the obligation of treaties.

But let it be remembered, that the appellate jurisdiction of the
supreme court, as it is, is one of perfect equality between the
States and the United States. It acts upon the constitution and
laws of both, in the same way, to the same extent, for the same
purposes, and with the same final result. Neither the dignity
nor the independence of either are lessened by its organization
or action.

The same electors choose the members of the house of rep-
resentatives who choose the members of the most popular branch
of the state legislatures. The senators of the United States are
chosen by the legislatures of the States. The senate and house
of representatives of the United States exercise their legisla-
tive powers independently of each other, their concurrence being
necessary to pass laws. The States are represented in the one,
the people in the other and in both. But as it was thought that

they and the state legislatures might pass laws conflicting with the letter or the spirit of the constitution under which they legislated, it became necessary to make a judicial department for the United States, with a jurisdiction best suited to preserve harmony between the States, severally and collectively, with the national government, and which would give the people of all of the States that confidence and security under it anticipated by them when they announced, " that we, the people of the United States, in order to form a more perfect union, establish justice and domestic tranquillity, provide for the common defence, and promote the general welfare, and secure the blessings of liberty to ourselves and our posterity, do ordain this constitution for the United States." Without a judicial department, just such as it is, neither the powers of the constitution nor the purposes for which they were given could have been attained.

We do not know a case more appropriate to show the necessity for such a jurisdiction than that before us.

A citizen of the United States, residing in Connecticut, having a large pecuniary interest in a bank in Ohio, with a board of directors opposed, in fact, to the only course which could be taken to test the constitutional validity of a law of that State bearing upon the franchises of their corporation, is told by the directors, that though they fully concur with him in believing the tax law of Ohio unconstitutional and in no way binding upon the bank, they will not institute legal proceedings to prevent the collection of the tax, " in consideration of the many obstacles in the way of resisting the tax in the state courts." Without partaking, ourselves, in their uncertainty of relief in the courts of Ohio, it must be admitted their declaration was calculated to diminish this suitor's confidence in such a result, and to induce him to resort to the only other tribunal which there was to take cognizance of his cause. Besides, it was not his interest alone which would be affected by the result. Hundreds, citizens of the State of Ohio and citizens of other States, are concerned in the question. Millions of money in that State, and millions upon millions of banking capital in the other States, are to be affected by its judicial decision; all depending upon the assertion, in opposition to the claim of the complainant, that a new constitution of a State supersedes every legislative enactment touching its own internal policy, and bearing upon the interest of persons, which may have been the subject of legislation under a preceding constitution. In the words of the counsel for the defendant, that all such legislation must give way when found to contravene the will of the sovereign people, subsequently expressed in a new state constitution. The assertion may be met and confuted, without further argument, by what

Dodge v. Woolsey.

was said by Mr. Madison, in the 43d number of The Federalist, upon the 6th article of the constitution, which is: "All debts and engagements entered into ·before the adoption of this constitution. shall be as valid against the United States under this constitution as under the confederation." His remark is, "This can only be considered· as a declaratory proposition, and may have been inserted, among other reasons, for the satisfaction of foreign creditors, who cannot be strangers to the pretended doctrine, that a change in the political form of civil society has the magical effect of dissolving its moral obligations."

And here we will cite another passage from the writings of that great statesman, and venerated man by every citizen of the United States who knows how much his political wisdom contributed to the establishment of our American popular institutions. He says, in the 22d number of The Federalist: "A circumstance which shows the defects of the confederation remains to be mentioned — the want of a judiciary power. Laws are a dead letter without courts to expound and define their true meaning and operation. The treaties of the United States, to have any force at all, must be considered as a part of the law of the land. Their true import, as regards individuals, must, like all other laws, be ascertained by judicial· determinations. To produce uniformity in these determinations, they ought to be submitted to a supreme tribunal; and this tribunal ought to be instituted under the same authorities which form the treaties themselves. These ingredients are both indispensable. If there is in each State a court of final jurisdiction, there may be as many different final determinations on the same point as there are courts. There are endless diversities in the opinions of men. We often see not only different courts, but the judges of the same court, differing from each other. To avoid the·confusion which would unavoidably result from the contradictory decisions of a number of independent judicatures, all nations have found it necessary to establish one tribunal paramount to the rest, possessing a general superintendence, and authorized to settle and declare in the last resort a uniform rule of civil justice. This is the more necessary where the frame of the government is so compounded that the laws of the whole are in danger of being contravened by the laws of the parts. In this case, if the particular tribunals are invested with a right of ultimate decision, besides the contradictions to be expected from difference of opinion, there will be much to fear from the bias of local views and prejudices, and from the interference of local institutions. As often as such an interference should happen, there would be reason to apprehend that the provisions of the particular laws might be preferred to those of the general laws,

from the deference which men in office naturally look up to that authority to which they owe their official existence."

Hitherto we have shown from the constitution itself that the framers of it meant to provide a jurisdiction for its final interpretation, and for the laws passed by Congress, to give them an equal operation in all of the States.

But there are considerations out of the constitution which contribute to show it, which we will briefly mention. Without such a judicial tribunal there are no means provided by which the conflicting legislation of the States with the constitution and the laws of congress may be terminated, so as to give to either a national operation in each of the States. In such an event no means have been provided for an amicable accommodation; none for a compromise; none for mediation; none for arbitration; none for a congress of the States as a mode of conciliation. The consequence of which would be a permanent diversity of the operation of the constitution in the States, as well in matters exclusively of public concern as in those which secure individual rights. Fortunately it is not so. A supreme tribunal has been provided, which has hitherto, by its decisions, settled all differences which have arisen between the authorities of the States and those of the United States. The legislation under which its appellate power is exercised has been of sixty-seven years' duration, without any countenanced attempt to repeal it. It is rather late to question it; and in continuing to exercise it, this court complies with the decisions of its predecessors, believing, after the fullest examination, that its appellate jurisdiction is given in conformity with the constitution.

The last position taken by the counsel for the defendant, now the appellant here, is, that George C. Dodge was in the discharge of his official duty as treasurer of Cuyahoga county, in the State of Ohio, when interrupted by the mandate of the circuit court; that the tax in his hands for collection against the bank was regularly assessed under a valid law of the State, passed April 18, 1852, in conformity with the requisitions of the constitution, adopted June 17, 1851, which took effect 1st September, 1851.

It was admitted, in the argument of it, that the only difference between this case and that of the Piqua Branch of the State of Ohio *v.* Jacob Knoop, 16 Howard, 369, is, that the latter was a claim for a tax under a law of Ohio, of March 21, 1851, under the former constitution of Ohio, of 1802; and that the tax now claimed is assessed under the act of April 18, 1852, under the new constitution of Ohio.

Both acts, in effect, are the same in their operation upon the charter of the bank, as that was passed by the general assembly

of Ohio, in the year 1845. Each of them is intended to collect, by way of tax, a larger sum than the bank was liable to pay, under the charter of 1845. This is admitted. It is not denied, the record shows that the tax assessed for the year 1853 exceeds the sum to which it was liable, under its charter, $11,565$\frac{22}{100}$. The tax assessed is $14,771$\frac{87}{100}$. The tax which it would have paid, under the act of 1845, would have been $3,206$\frac{65}{100}$.

The fact raises the question whether the tax now claimed has not been assessed in violation of the 10th section of the 1st article of the constitution, which declares that no State shall pass any law impairing the obligation of contracts.

The law of 1845 was an agreement with the bank, *quasi ex contractu* — and also an agreement separately with the shareholders, *quasi ex contractu* — that neither the bank as such, nor the shareholders as such, should be liable to any other tax larger than that which was to be levied under the 60th section of the act of 1845.

That 60th section is, "that each banking company under the act, on accepting thereof and complying with its provisions, shall semiannually, on the days designated for declaring dividends, set off to the State six per cent. on the profits, deducting therefrom the expenses and ascertained losses of the company for the six months next preceding, which sum or amount so set off shall be in lieu of all taxes to which the company, or the stockholders therein, would otherwise be subject. The sum so set off to be paid to the treasurer, on the order of the auditor of the State." The act under which the tax of 1853 has been assessed is: "That the president and cashier of every bank and banking company that shall have been, or may hereafter be, incorporated by the laws of this State, and having the right to issue bills of circulation as money, shall make and return, under oath, to the auditor of the county in which such bank or banking company may be situated, in the month of May annually, a written statement containing, first, the average amount of notes and bills discounted or purchased, which amount shall include all the loans or discounts, whether originally made or renewed during the year aforesaid, or at any previous time, whether made on bills of exchange, notes, bonds, or mortgages, or any other evidence of indebtedness, at their actual cost value in money, whether due previous to, during, or after the period aforesaid, and on which such banking company has at any time reserved or received, or is entitled to receive, any profit or other consideration whatever; and, secondly, the average amount of all other moneys, effects, or dues of every description belonging to the bank or banking company, loaned, invested, or otherwise used with a view to profit, or upon which the bank, &c., receives, or is entitled to receive, interest."

The two acts have been put in connection, that the difference between the modes of taxation may be more obvious; and it will be readily seen, that the second is not intended to tax the profits of the bank, but its entire business, capital, circulation, credits, and debts due to it, being professed to be intended to equalize the tax to be paid by the bank with that required to be paid upon personal property. A careful examination of the two acts and of the tabular returns annexed to this opinion, will prove that such equality of taxation has not been attained. It will show that the bank is taxed more than three times the number of mills upon the dollars that is assessed upon personal property, whatever may be comprehended under that denomination by the act of the 13th April, 1852. But if it did not, it could make no difference in our conclusion. For the tax to be paid by the bank under the act of 24th February, 1824, is a legislative contract, equally operative upon the State and upon the bank, and the stockholders of the bank, until the expiration of its charter, which will be in 1866. No critical examination of the words, "that on the days designated for declaring dividends, to wit, on the first Monday in May and November of each year, the bank shall set off to the said State of Ohio six per cent. on the profits, deducting therefrom the expenses and ascertained losses of said company for six months next preceding each dividend day, and that the sums or amounts so set off shall be in lieu of all taxes to which said company or the stockholders thereof on account of stock owned therein would otherwise be subject," could make them more exact in meaning than they are. The words "would otherwise be subject," relate to the legislative power to tax, and is a relinquishment of it, binding upon that legislature which passed the act, and upon succeeding legislatures as a contract not to tax the bank during its continuance with more than six per cent. upon its semiannual profits. A change of constitution cannot release a State from contracts made under a constitution which permits them to be made. The inquiry is, is the contract permitted by the existing constitution? If so, and that cannot be denied in this case, the sovereignty which ratified it in 1802 was the same sovereignty which made the constitution of 1851, neither having more power than the other to impair a contract made by the state legislature with individuals. The moral obligations never die. If broken by states and nations, though the terms of reproach are not the same with which we are accustomed to designate the faithlessness of individuals, the violation of justice is not the less.

This case is coincident with that of the Piqua Branch of the State Bank of Ohio v. Knoop, 16 How. 369, decided by this

Dodge *v.* Woolsey.

court in the year 1853. It rules this in every particular; and to the opinion then given we have nothing to add, nor any thing to take away. We affirm the decree of the circuit court, and direct a mandate accordingly.

Mr. Justice CATRON, Mr. Justice DANIEL, and Mr. Justice CAMPBELL dissented.

---

(No. 1.)

*Statement of the Commercial Branch Bank, Cleveland, made to the Auditor of Cuyahoga county, May 25, 1853.*

1st. The average amount of notes and bills discounted and purchased by the Commercial Branch Bank of Cleveland, including all loans or discounts whether made or renewed during the year, from May 1st, 1852, to May 1st, 1853, inclusive, is................................... $582,735

2d. The average amount of all other moneys, effects, or dues of every description belonging to said Commercial Branch Bank, loaned, invested or otherwise used or employed with a view to profit, or upon which said bank received, or was entitled to receive, interest during the above period, was........................................ 88,714

Total........................... $671,449

W. A. OTIS, *President.*

F. P. HANDY, *Cashier.*

STATE OF OHIO, *Cuyahoga county, ss.*

CLEVELAND, *May* 25, 1853.

Personally appeared William A. Otis, President, and Freeman P. Handy, Cashier of the Commercial Branch Bank of Cleveland, and made oath that the aforesaid statement is true and correct, according to their best knowledge and belief.

Before me, witness my hand. JOHN T. NEWTON, *Notary Public.*

The following resolutions have been adopted by the directors of this bank :—

*Resolved,* That in the opinion of the directors of the Commercial Branch Bank of Cleveland, that the act for the assessment and taxation of all property in this State, and for levying taxes thereon according to its true value in money, passed April 13, 1852, so far as it imposes a tax on this bank or banking company, or the listing or valuing of its property different from that required by its charter, without the consent of the corporators, is unconstitutional and void, and is also repugnant to the constitution of the State of Ohio—which declares that all laws shall be passed taxing by uniform rule all investments in stock or otherwise, and that property employed in banking shall bear a burden of taxation equal to that imposed on the property of individuals; and, again—that the property of corporations now existing or hereafter created, shall be forever subject to taxation the same as the property of individuals, and therefore creates no legal liability against this bank, and that this bank will not, as at present advised, pay such additional tax unless compelled by law, and hereby enters its protest against its imposition and collection.

*Resolved,* That the cashier attach a copy of these resolutions, signed by the president and cashier of this bank, to the return of this bank, made under said law. Also file a copy so attested with the treasurer of this county, and transmit a like copy to the

Dodge *v.* Woolsey.

auditor of state, as an evidence of the dissent of this bank from all the provisions of said law, and its determination to rely upon the constitution and legal rights of this bank under its charter. F. P. HANDY, *Cashier.*

W. A. OTIS, *President.*

COMMERCIAL BRANCH BANK, *Cleveland, May* 25, 1853.

AUDITOR'S OFFICE, CUYAHOGA COUNTY,
*Cleveland, February* 22, 1856.

I hereby certify, that the foregoing is a true copy of the statement of the Commercial Branch Bank, made to the Auditor of Cuyahoga county, May 25, 1853.
WILLIAM FULLER, *County Auditor.*

---

## (No. 2.)

AUDITOR'S OFFICE, CUYAHOGA COUNTY,
*Cleveland, February,* 22, 1856.

I hereby certify, that there was entered upon the tax duplicate of this county, for the year 1853, for taxation, in the name of the Commercial Branch Bank of Cleveland, the sum of six hundred seventy-one thousand four hundred and forty-nine dollars, in accordance with the statement of said bank, made to the auditor of said county, May 25, 1853.

And that the amount of taxes assessed thereon in said year, for State, county, city, and road purposes, is fourteen thousand seven hundred and seventy-one dollars eighty-seven cents and seven mills, ($14,771 87 7,) as follows.
WILLIAM FULLER, *County Auditor.*

| Owners' Names. | Personal prop'y. | Value — dolls. | Total taxes on duplicate. | State, county, and city taxes. | Road Tax. |
|---|---|---|---|---|---|
| | | | Dolls. Cts. Ms. | Dolls. Cts. Ms. | Dolls. Cts. Ms. |
| Commercial Branch Bank............ | ...:..... | 671,449 | 14,771  87  7 | 14,234  71  8 | 537    15    9 |

Mr. Justice CAMPBELL dissenting.

The following case is made upon the record of this cause:—

The Commercial Bank of Cleveland, Ohio, was organized in 1845, according to the act of the general assembly of February, 1845, for the incorporation of the State Bank of Ohio and other companies, with a capital which was increased in 1848 to $175,000, and placed under the management of five directors.

From its organization until 1851 the taxes of the bank were determined by the 60th section of the act aforesaid, which required the banks semiannually to set off to the State six per cent. of the net profits for the six months next preceding, and

the sum so set off the act declared should be " in lieu of all taxes
to which such company or the stockholders thereof on account
of stock owned therein would otherwise be subject." In the
year 1851, the general assembly of Ohio altered this rule of tax-
ation, and required that the capital stock, surplus and contingent
funds of the banks should be listed for taxation at their money
value, and should be assessed for the same purposes and to the
same extent that personal property might be in the place of their
location.

During the same year the people of Ohio, in the mode pre-
scribed in their fundamental law, adopted a new constitution.
One of the articles (art. 12, § 3) requires "the general assembly
to provide by law for taxing the notes and bills discounted or
purchased, and all other property, effects, dues of every descrip-
tion (without deduction) of all banks now existing or hereafter
created, and of all bankers, so that all property employed in
banking shall always bear a burden of taxation equal to that
imposed on the property of individuals." In 1852, the general
assembly fulfilled this direction by a law which required the
banks to disclose the average amount of all bills, notes discounted
or purchased, and the average amount of their moneys, dues
and effects, so as to afford a basis for taxation ; and by the same
act taxes were directed to be laid upon these amounts without
deduction.

The directors, stockholders, and officers of this bank have dis-
puted the validity of these changes in the rule of taxation, as
violating a right derived by contract, obligatory on the State,
and contained in the 60th section of the act first mentioned, and
no voluntary obedience has been rendered to them ; but, on the
contrary, the successive measures taken for the collection of
these taxes have met with opposition from the corporation, and
submission has always been accompanied with a protest on the
part of the directors, in which their determination was expressed
to rely upon the constitutional and legal rights of the bank.

The taxes for the year 1852 were collected in current bank
bills, and the packages were prepared and placed within the
reach of the treasurer, who held the duplicate for collection, by
the officers of the bank, and immediately after they were assigned
by the bank to one Deshler, who replevied the same by a writ
from the circuit court of the United States for Ohio, and thus
made a case which subsequently came to this court. Deshler *v.*
Dodge, 16 How. 622.

In December, 1853, some five days before the taxes were pay-
able, John M. Woolsey, a stockholder of the bank for thirty shares,
at the par value of $100 each, addressed the directors of the
bank a letter, requiring them " to institute the proper legal pro-.

ceedings to prevent the collection" of the assessment for that year, averring that the bank was not bound to pay them. The board of directors replied, " that they considered the tax to have been illegally assessed, but in consideration of the many obstacles in the way of resisting said tax in the courts of Ohio they could not take the action they were called upon in the letter to take," but must leave to Mr. Woolsey to take such a course as he might be advised. It sufficiently appears that the treasurer is able to pay any damages which the bank might sustain, and no evidence exists of any indisposition of the directors to meet all the obligations of their station, except what is found in the letter I have described.

This bill was filed by Woolsey, as a stockholder of the bank, against the treasurer of the county of Cuyahoga, the five directors of the bank, and the corporation itself, alleging his apprehensions that the treasurer would proceed to make the collection of the excess above the tax due under the 60th section, and that it would impair the credit of the bank, invade its franchise, and ultimately compel its dissolution ; and that the directors had refused to take measures to prevent its collection, on his requisition, and prays for an injunction on the officer to restrain his further proceedings. The circuit court affirmed the bill so as to restrain the collection of all taxes assessed upon the bank, except such as were laid under the act of 1845.

The first inquiry that arises is, has this court a jurisdiction of the parties to the suit ? The case is one of a stockholder of a corporation, bringing the corporation before the courts of United States to redress a corporate wrong in which both are similarly interested. The early decisions of this court on this question would be conclusive against the bill. They require that the plaintiff should be from a State different from all the individual members of the corporation. The chief justice said, that invisible, intangible, and artificial being, that mere legal entity —a corporation aggregate—is certainly not a citizen ; and consequently cannot sue or be sued in the courts of the United States, unless the rights of the members in this respect can be exercised in their corporate name. 5 Cranch, 57, 61, 78 ; 6 Wheat. 450 ; 14 Pet. 60.

These cases required that the citizenship of all the corporators should appear on the record, so that the court might be sure that the controversy had arisen between citizens of different States, or citizens of a State and foreign states, citizens or subjects. In Marshall v. Baltimore and Ohio Railroad Co. 16 How. 314, the court relaxed its strictness in reference to this averment, and was satisfied by an allegation of the habitat of the corporation, but still intimated that the national character of the corporators

was an essential subject of inquiry in a question of jurisdiction. The court says: " The persons who act under these faculties and use the corporate name, may be justly presumed to be resident in the State which is the necessary habitat of the corporation, and where alone they can be made subject to suit, and should be estopped in equity from averring a different domicile as against those who are compelled to seek them there, and nowhere else." And again: " The presumption arising from the habitat of a corporation being conclusive of those who use the corporate name and exercise the faculties of it."

This case is one of a corporator suing the corporation of which he is a member, and is the first instance of such a case in the court. He cannot aver against the manifest truth, that all the corporators, himself included, are of a different State from himself, to give the court jurisdiction upon the principle of the earlier cases. And if the doctrine of an equitable estoppel can be applied to a subject where facts, and not arbitrary presumptions, were the only objects of consideration ; and if, indeed, the character of the corporator, as a matter of law, is to be assumed to be that of the *situs* of the corporation, then all the corporators, plaintiffs as well as defendants, stand upon this record as citizens of the same State, and this suit cannot be maintained. But if no inquiry into the citizenship of stockholders may be made; if a foreign stockholder, upon the real or affected indifference of a board of directors, or on some imaginary or actual obstacle to relief, arising in the state of opinion in the courts of the State, can draw questions of equitable cognizance into the courts of the United States, in which corporate rights are involved, or evils are threatened or inflicted on corporate property, making the corporation and its managers parties, then a very compendious method of bringing into the courts of the United States all questions in which these artificial beings are concerned has been invented, and the most morbid appetite for jurisdiction among all their various members will be gratified, and upon a class of cases where grave doubts exist whether those who made the constitution ever intended to confer any jurisdiction whatever. Nor can this jurisdiction be supported by affirming that the corporation is not a necessary party to the bill. The subject of the bill is the title of the corporation to an exemption under the act of incorporation, and its object is the protection of corporate franchises and property. The being of the corporation is charged to be an issue involved in the prayer for relief, and the inaction of the directors affords the motive for the suit.

The conduct of the directors was determined in the course of their duty as the governing body of the corporation, under the law of their organization. Their measures and judgments were

31 *

the acts of the corporation. Whether these were conclusive upon the corporators, or whether they might be impeached at the suit of a single dissenting shareholder; whether the relations between the State and the corporation were to be settled in a suit between them or in this suit, are the matters in issue, and the corporation was an essential party to their adjudication. The principle of the bill is, that in declining to take effective measures of prevention—that is, refusing to apply for an injunction—the directors abdicated their controlling powers, and any stockholder became entitled to intervene for the interests of himself and his associates. The decree in this cause is not a decree for the relief of this corporator, but is a decree for the corporation, and does not differ from a decree proper to a case of the corporation against the treasurer. It is clear, therefore, that the corporation was a necessary party to the bill, and so are the adjudged cases. Bagshaw v. East. Union R. R. Co. 7 Hare, 114; Cunningham v. Pell, 5 Paige, 607; Rumney v. Monce, Finch R. 334, 336; 1 Danl. Ch. Pr. 251; Charles. Ins. & T. Co. v. Sebring, 5 Rich. Eq. R. 342.

The case is one between a corporator and the corporation, and the jurisdiction cannot be affirmed unless the court is prepared to answer the question whether a mere legal entity, an artificial person, invisible, intangible, can be a citizen of the United States in the sense in which that word is used in the constitution; and relying upon the case of Marshall v. The Baltimore and Ohio Railroad Company; with a long list of antecessors, I am forced to conclude that it cannot be.

The court has assumed this jurisdiction, and I am therefore called to inquire whether a court of chancery can take cognizance of the bill? The act of incorporation of the bank charges the board of directors with the care of the corporate affairs, subject to an annual responsibility to the stockholders. The principle of a court of chancery is, to decline any interference with the discretion of such directors, or to regulate their conduct or management in respect to the duties committed to them.

The business of that court is to redress grievances illegally inflicted or threatened, not to supply the prudence, knowledge, or forecast requisite to successful corporate management. The facts of this case involve, in my opinion, merely a question of discretion in the performance of an official duty. In 1852, the taxes were withdrawn from the treasurer of Cuyahoga county, by an assignee of the bank, and were never passed into the State treasury. The supreme court of Ohio, subsequently to this, pronounced the taxes to be legally assessed upon these banks, and that there was no contract between the State and the banks, and there was no exemption from the tax by any thing apparent

in the act of 1845. Some of these judgments were pending in this court upon writs of error then undecided, no judgment having been given contrary to that of the authorities, legislative, executive, and judicial, as well as by the people of Ohio. It was under these conditions that this stockholder, who purchased stock after the controversy had arisen in Ohio, some five days before the taxes were payable, addressed the directors of the Commercial Bank to take preventive measures—that is, I suppose, to file a bill for an injunction instantly—and, upon their suggestion of difficulties, proceeds to take charge of the corporate rights of the bank by this suit, in the circuit court of the United States. The directors were elected annually; they were, collectively, owners of one tenth of the stock of the bank, and no evidence is shown that any other stockholder supposed that "preventive measures," under the circumstances, could be sustained. There is no charge of fraud, collusion, neglect of duty, or of indifference by the directors, save this omission to take some undefined "preventive measures," which the plaintiff affected to suppose might be proper.

I understand the rule of chancery, in reference to such a case, to be that no suit can be maintained by an individual stockholder for a wrong done, or threatened, to such a corporation, unless it appears that the plaintiff has no means of procuring a suit to be instituted in the name of the corporation; and that the rule is universal, applicable, as well to the cases where the acts which afford the ground for complaint were either such as a majority might sanction, or whether it belonged to the category of those acts by which no stockholder could be bound except by his own consent. This principle has the highest sanction in the decisions of that court. (Foss v. Harbottle, 2 Hare, 461—affirmed 1 Phil. 790 ; 2 Phil. 740 ; 7 Hare, 130.) The principle is an obvious consequence from the relations between the officers and members of a chartered corporation, and the corporation itself. These are explained in Smith v. Hurd, 12 Met. 371. The court says: "There is no legal privity, relation, or immediate connection, between the holders of shares in a bank in their individual capacity, on the one side, and the directors of the bank on the other. The directors are not the bailees, the factors, agents, or trustees of such individual stockholders. The bank is a corporation and body politic having a separate existence, as a distinct person in law, in whom the whole stock and property of the bank are vested, and to whom all agents, debtors, officers, and servants, are responsible for all contracts, express or implied, made in reference to such capital; and for all torts and injuries, diminishing or impairing it." The corporation, therefore, must vindicate its own wrongs, and assert its own rights, in the modes pointed out by law.

I do not say that a court of chancery will never permit an individual stockholder to come before it to assert a right of the corporation in which he is a shareholder, where there is an obstacle of such a nature that the name of the corporation cannot be employed before legitimate tribunals in their regular modes of proceeding, but the burden is thrown upon the plaintiff to establish the existence of an urgent necessity for such a suit.

The consideration of analogous cases will strengthen this conclusion; cases where courts of chancery are more free to intervene, from the fiduciary relations between the parties and the extent of its general jurisdiction over them. Such are cases of danger to the interests of a creditor of an estate from the collusion of an executor with the debtor of the estate, or the insolvency of the executor; or where an executor wrongfully fails to make a settlement with a surviving partner, and a residuary legatee seeks one entire settlement of the estate against the executor and partner; or where a decedent in his life has fraudulently conveyed assets, and his executor is estopped to impute fraud, and there are creditors; or where the managers of a joint-stock company have been guilty of fraud, illegality, waste, and their stockholders desire relief. In all these cases the court of chancery will suffer a party remotely interested to institute the suit which his trustee, or other representative, should have brought, and will grant the relief on that suit which would have been appropriate to the case of him who should have commenced it. Sir John Romilly, in a late case belonging to one of these categories, says:

" To support such a bill as this it is not sufficient to prove that it may be an unpleasant duty to the executors and trustees to take the necessary steps for protecting the property intrusted to them. It is not sufficient to show that it will be for their interests not to take such steps. It is necessary to show that they prefer their own interests to their duty, and that they intend to neglect the performance of the obligation incidental to the office imposed upon them, and which they assumed to perform; or, as said in Travis v. Mylne, that a substantial impediment to the prosecution by the executors of the rights of the parties interested in the estate against the surviving partner exists." Stainton v. Carron Co. 23 L. & Eq. 315; Travis v. Milne, 9 Hare, 141; Hersey v. Veazie, 11 Shep. 1; Colquitt v. Howard, 11 Geo. 556.

These cases afford no support to this suit. The Cleveland Bank has betrayed no purpose to abandon its corporate duty. The interests and obligations of the directors coincide to support its pretensions. There is no supineness in their past conduct, nor indifference to the existing peril. The evidence, at the most, convicts them only of a present disinclination to commence suits,

which were likely to be unproductive, at the request of a single shareholder. The answer shows that the taxes for 1852 had not been recovered by the State, but had been retaken by an assignee of the bank. Nor does the correspondence show that the directors had decided to abandon the contest. The case here does not at all fulfil the conditions on which the interposition of a shareholder is allowable. Elmslie *v.* McAulay, 3 Bro. C. C. 224, 1 Phil. 790; Law *v.* Law, 2 Coll. 41; Walker *v.* Trott, 4 Ed. Ch. R. 38.

But the evidence does not allow me to conclude that any impediment whatever existed to a suit in the name of the corporation, from any disposition of the directors to resist the claims of the State. Their protest appears at every successive stage of the action of the fiscal officers. This suit is evidently maintained with their consent; there has been no appearance either by the directors or the corporation, but they abide the case of the stockholder. The decree is for the benefit of the corporation. The question then is, can a corporation belonging to a State, and whose officers are citizens, upon some hope or assurance that the opinions of the courts of the United States are more favorable to their pretensions, by any combination, contrivance, or agreement with a non-resident shareholder, devolve upon him the right to seek for the redress of corporate grievances, which are the subjects of equitable cognizance in the courts of the United States, by a suit in his own name. In my opinion, there should be but one answer to the question.

I come now to the merits of the case made by the bill.

In the suit of the Piqua Bank *v.* Knoop, 16 How. 369, I gave the opinion that the act of February, 1845, did not contain a contract obligatory between the State of Ohio and the banking corporations which might be originated by it, in reference to the rule of taxation to be applied to their capital or business. That the act imposed no limit upon the power of the general assembly of the State, but that the rate of taxation established in that act was alterable at their pleasure. To that opinion I now adhere.

But assuming a contract to be collected from the indeterminate expressions of the 60th section of the act, as interpreted by its general objects and the supposed policy of the State, the question is presented, what consequence did the reconstitution of the political system of the State by the people in 1851, and their direction to the legislature to adopt equality as the rule of assessment of taxes upon corporate property, accomplish to the claims of these corporations?

Certainly no greater question—none involving a more elemental or important principle—has ever been submitted to a judicial

tribunal. It involves the operation and efficiency of the fundamental principles on which the American constitutions have been supposed to rest.

The proposition of this confederacy of some fifty banking corporations, having one fortieth of the property of the State, is, that by the law of their organization for the whole term of their corporate being, there exists no power in the government nor people of Ohio to impair the concessions contained in the act of 1845, particularly that determining the amount of their contribution to the public revenue. This proposition does not depend for its truth upon the limitation of time imposed upon the corporate existence of the banks. It would not affect the proposition if the charters were for a century, or in perpetuity. Nor does the proposition derive strength from the fact that the statute applies only to banking corporations, or corporations confined to a single form of commercial dealing. The proposition would have had the same degree of accuracy if the act had been universal, applicable to all private corporations, whether for manufactures, trade, intercourse, mining, morals, or religion. It is said by a competent authority, that in the State of Massachusetts there are near twenty-five hundred trading corporations, and that more than seven tenths of the real and personal property of that State is held by corporations. The proportion between the property of corporations and individuals is greater there than in other States, but the property held by corporations in other States is large enough to awaken the most earnest attention. A concession of the kind contained in this act, by a careless or a corrupt legislature, for a term or in perpetuity, would impair in many States their resources to an alarming extent.

Writers upon the condition of the Turkish empire say, that three fourths of the landed property of the empire is held in mortmain, as vakuf by mosques or charitable institutions, for their own use, or in trust for their owners. This property ceases to contribute to the public revenues, except in a specific form of certain objectionable taxes on produce, and is inalienable. If held in trust, it is exempt from forced sales and confiscations, and, on the death of the owner without children, passes to the mosque or other charitable trustee. In that empire, the ecclesiastical and judicial is the dominant interest, for the Ulemas are both priests and lawyers, just as the corporate moneyed interest is dominant in Ohio, and in either country that interest claims exemption from the usual burdens and ordinary legislation of the State. The judgment of this court would establish the permanent existence of such an incubus upon the resources and growth of that country, if that interest should have taken their privileges in the form of a contract, and had such a constitution as ours. Yet the

first step for the regeneration of Turkey, according to the wisest statesmanship, is to abolish the vakuf.

Bentham, treating upon constitutional provisions in favor of contracts, says : " If all contracts were to be observed, all misdeeds would be to be committed, for there is no misdeed the committal of which may not be made the subject of a contract; and to establish in favor of themselves, or of any other person or persons, an absolute despotism, a set of legislators would have no more to do than to enter into any engagement—say with a foreign despot, say with a member of their own community—for this purpose." And were this to happen, should it be that a State of this Union had become the victim of vicious legislation, its property alienated, its powers of taxation renounced in favor of chartered associations, and the resources of the body politic cut off, what remedy has the people against the misgovernment ? Under the doctrines of this court none is to be found in the government, and none exists in the inherent powers of the people, if the wrong has taken the form of a contract. The most deliberate and solemn acts of the people would not serve to redress the injustice, and the overreaching speculator upon the facility or corruption of their legislature would be protected by the powers of this court in the profits of his bargain. Where would the people find a remedy ? Let the case before us form an illustration. Congress cannot limit the term nor abolish the privileges of these corporations; they are corporations of Ohio, and beyond her limits they have no legal existence ; they live in the contemplation of her laws and dwell in the place of their creation. (13 Pet. 512; 16 How. 314.) Nor can congress enlarge the subjects for state taxation, nor interfere in the support of the state government. They could not empower the State to collect taxes from these corporations. Were the resources of the State oppressed with the burden of a Turkish vakuf, congress could not afford relief.

The faculties of the judicial department are even more fatal to the State than the impotence of congress. The courts cannot look to the corruption, the blindness, nor mischievous effects of state legislation, to determine its binding operation. (Fletcher v. Peck, 6 Cr. 87.) The court, therefore, becomes the patron of such legislation, by furnishing motives of incalculable power to the corporations to stimulate it, and affording stability and security to the successful effort. Where, then, is the remedy for the people ? They have none in their state government nor in themselves, and the federal government is enlisted by their adversary. It may be that an amendment of the constitution of the United States, by the proposal of two thirds of congress and the ratification of the legislatures of three fourths of the States,

might enable the people of Ohio to assess taxes for the support of their government, upon terms of equality among her citizens.

The first observation to be made upon this is, that these extraordinary pretensions of corporations are not unfamiliar to an inquirer into their nature and history. The steady aim of the most thoroughly organized and powerful of the corporate establishments of Europe has ever been to place themselves under the protection of an external authority, superior to the government and people where they dwell—an authority sufficiently powerful to shield them from responsibility and to secure their privileges from question. I do not refer to the claim of kings to passive obedience under a divine title. Ecclesiastical corporations, acknowledging the supremacy of the Pope, afford a case parallel to that before us. I find their principles compendiously declared in an allocution of a minister of Rome to the court of Sardinia, in reference to taxes on church property there. I find that "religious corporations, forming a portion of the ecclesiastical family at large, are by their very nature, under the guardianship and authority of the church; and, consequently, no measure or laws can be adopted with respect to them, except by the spiritual power, or through its agency, especially in what touches their existence or their conduct in the institutions to which they respectively belong; nor can any other rule be recognized, even in matters that concern their property. It is, in truth, beyond dispute that the property possessed by ecclesiastical or religious foundations belongs to the general category of property of the church, and constitutes a true and proper portion of its patrimony. In consequence whereof, as the property of the church is inviolable, so are the possessions of such foundations." Nor was the doctrine of the inviolableness of contracts foreign to these controversies. The sagacious and far-sighted members of the ecclesiastical interests fortified themselves with concordats, and these concordats were affirmed to be "contracts," and, like these, "entail obligations;" and "if the bond of a bargain is to be respected in private life," so they declared "it is sacred and inviolable in the life of States." A slight change of expression will demonstrate that the principle of corporate policy, the dictate of corporate ambition, which has predominated in the contests in Europe, leading to desolating wars, is the same which this court is required to sanction in favor of corporations in the United States. The allocution of the Ohio banks to this court may be thus stated: "That the charters of incorporation granted by the state governments are in their essence and nature 'contracts,' which 'entail obligations;' that, consequently, they are finally under the guardianship and protection of the judiciary establishment of the United States; that no acts of the state

Dodge *v*. Woolsey.

legislature which conferred them, in whatever touches their existence, methods of proceeding, or corporate privilege, are binding on them; that, as the state legislatures are agents of the people, whatever they have done in these respects is obligatory upon them, and irrevocable by them, in any form of their action, or in the exercise of any of their sovereign authority; and as the judiciary establishment of the Union is charged with the duty of holding the States and people to their limited orbits, and to afford redress for violated contracts, and to prevent serious resulting damage; and as these corporations cannot sue in the courts of the United States, it is the duty of the court to suffer the corporate wrongs to be redressed in the suit and at the solicitation of any of their stockholders who can appear there— for the state of opinion in the state courts will not allow the hope of redress from them."

The allowance of this plea interposes this court between these corporations and the government and people of Ohio, to which they owe their existence, and by whose laws they derive all their faculties. It will establish on the soil of every State a caste made up of combinations of men for the most part under the most favorable conditions in society, who will habitually look beyond the institutions and the authorities of the State to the central government for the strength and support necessary to maintain them in the enjoyment of their special privileges and exemptions. The consequence will be a new element of alienation and discord between the different classes of society, and the introduction of a fresh cause of disturbance in our distracted political and social system. In the end, the doctrine of this decision may lead to a violent overturn of the whole system of corporate combinations.

Having thus examined the proportions of the doctrine contained in the judgment of the court, I oppose to it a deliberate and earnest dissent.

And, first, as to the claim made for the court to be the final arbiter of these questions of political power, I can imagine no pretension more likely to be fatal to the constitution of the court itself. If this court is to have an office so transcendent as to decide finally the powers of the people over persons and things within the State, a much closer connection and a much more direct responsibility of its members to the people is a necessary condition for the safety of the popular rights. Justice Woodbury, in Luther *v*. Borden, 7 How. 52, has exposed this danger with great discrimination and force. He said: "Another evil, alarming and little foreseen, involved in regarding these as questions for the final arbitrament of judges, would be, that in such an event all political privileges and rights would in a dispute

among the people depend on our decision finally. We would possess the power to decide against them, as well as for them; and, under a prejudiced or arbitrary judiciary, the public liberties or popular privileges might thus be much perverted, if not entirely prostrated. And if the people, in the distribution of powers under the constitution, should ever think of making judges supreme arbiters in political controversies, when not selected by nor amenable to them, nor at liberty to follow the various considerations that belong to political questions in their judgments, they will dethrone themselves, and lose one of their invaluable birthrights—building up in this way slowly, but surely, a new sovereign power in this republic in most respects irresponsible, unchangeable for life, and one, in theory at least, more dangerous than the worst elective monarchy in the worst of times."

The inquiry recurs, have the people of Ohio deposited with this tribunal the authority to overrule their own judgment upon the extent of their own powers over institutions created by their own government and commorant within the State? The fundamental principle of American constitutions, it seems to me, is, that to the people of the several States belongs the resolution of all questions, whether of regulation, compact, or punitive justice, arising out of the action of their municipal government upon their citizens, or depending upon their constitutions and laws, and are judges of the validity of all acts done by their municipal authorities in the exercise of their sovereign rights, in either case without responsibility or control from any department of the federal government. This I understand to be the import of the municipal sovereignty of the people within the State.

In 1802, the inhabitants of Ohio were released from their pupilage to the federal authority, placed in full possession of their rights to self-government, and were invited to adapt their institutions to the federal system, of which the State, when formed, was authorized to become a member.

The people of Ohio, by their state constitution, reserved to themselves " complete power " to " alter, reform, and abolish their government;" " to petition for redress of grievances;" and to " recur, as often as might be necessary, to the first principles of government." It was by a constitution adopted according to established forms, and expressive of the sovereign will of the body politic, that the rule of taxation complained of in this suit was prescribed.

The inquiry arises, to what did the authority of the people extend? It was their right to ameliorate every vicious institution, and to do whatever an enlightened statesmanship might

prescribe for the advancement of their own happiness; and for this end, persons and things in the State were submitted to their authority. A material distinction has always been acknowledged to exist as to the degrees of the authority that a people could legitimately exert over persons and corporations. Individuals are not the creatures of the State, but constitute it. They come into society with rights, which cannot be invaded without injustice. But corporations derive their existence from the society, are the offspring of transitory conditions of the State; and, with faculties for good in such conditions, combine durable dispositions for evil. They display a love of power, a preference for corporate interests to moral or political principles or public duties, and an antagonism to individual freedom, which have marked them as objects of jealousy in every epoch of their history. Therefore, the power has been exercised, in all civilized States, to limit their privileges, or to suppress their existence, under the exigencies either of public policy or political necessity.

Sir James McIntosh says: " Property is indeed, in some sense, created by act of the public will, but it is by one of those fundamental acts which constitute society. Theory proves it to be essential to the social state. Experience proves that it has, in some degree, existed in every age and nation of the world. But those public acts, which form and endow corporations, are subsequent and subordinate. They are only ordinary expedients of legislation. The property of individuals is established on a general principle, which seems coeval with civil society itself. But bodies are instruments fabricated by the legislature for a specific purpose, which ought to be preserved while they are beneficial, amended when they are impaired, and rejected when they become useless or injurious." Vind. Gal. 48, note.

Who, in the United States, is to determine when the public interests demand the suppression of bodies whose existence or modes of action are contrary to the well-being of the state?

If the powers of the people of a State are inadequate to this object, then their grave and solemn declarations of their rights and their authority over their governments, and of the ends for which their governments and the institutions of their governments were framed, and the responsibility of rulers and magistrates to themselves, are nothing but " great swelling words of vanity."

But not only is the jurisdiction of Ohio " complete " over the public institutions of her government, but the subject-matter upon which their will was expressed in their constitution was independently of their control over the corporations, one over which their jurisdiction was plenary. They declared in what

manner property held within the State by these artificial bodies should contribute to the public support, in the form of regular and apportioned taxation. When the constitution of the United States was before the people of the States for their ratification, they were told, that, with the exception of duties on exports and imports, the States retained " an independent and uncontrollable authority " to " raise their own revenue in the most absolute and unqualified sense;" and that any attempt, on the part of the federal government, to abridge them in the exercise of it, would be " a violent assumption of power unwarranted by any clause of the constitution." (Fed. 163, by Hamilton.) And the opinions of this court are filled with disclaimers on the same subject. 4 Wheat. 429.

The true principle, therefore, would seem to be, that if there was any conflict in the tax laws of the State, and a supposed contract of its legislative or executive agents with one of its citizens, it would be for the State to harmonize the two upon principles of general equity; but in no condition of facts for the judiciary department to interfere with state affairs by writs of replevin or injunction. The acknowledgment of such a power would be to establish the alarming doctrine that the empire of Ohio, and the remaining States of the Union, over their revenues, is not to be found in their people, but in the numerical majority of the judges of this court.

In the opinion I gave in the case of the Piqua Bank, I exhibited evidence that the care of the public domain, whether consisting of crown lands or of taxes on property, belonged to the sovereign power of the State, and that improvident alienations by the crown were, from time to time, set aside by the parliament of Great Britain under the dictates of a public policy. Twelve acts of parliament are cited by Sir William Davenant of this character, and having this object. Davenant, Grants and Res. 244.

A similar condition existed in France. The kings were bound, by their coronation oath, " to maintain and preserve the public domain with all their power," and it was an inviolable maxim, that it could not be alienated, except in specified cases determined in the fundamental laws of the monarchy. This legal result was declared by the national assembly in 1790, to the effect that the public domain, with all its accretions, belonged to the nation; that this property is the most perfect that can be imagined, since there exists no superior power that can restrain or modify it; that the power to alienate—the essential attribute of property—exists in the nation; that every appropriation of the public domain is essentially revocable, if made without the consent of the nation; that it preserves over the property alien-

Dodge v. Woolsey.

ated the same right and authority as if it had remained under its control; and that this principle was one which no lapse of time nor legal formality could evade. All grants, therefore, of the public rights, and especially those partaking of the nature of taxes, or subsidies, such as fines, confiscations, and stamps, were revoked, because the subject was not alienable. 8 Merlin Rep., tit. Dom. Pub.; 1 Proud., Dom. Pub. 62.

If the power to review the illegal or improvident acts of a monarch, by which " the domain and patrimony of the crown (one of the principal sinews of the State, as they are termed in the ordinances) was dilapidated or impoverished, in the nearly absolute monarchies of Europe, was reserved to the nation, it would seem to follow that in the American States, where so little has been conceded to the government, and whose " complete power" to amend or abrogate is so distinctly reserved that no inference nor implication can arise, that the same has been relinquished or abdicated. My conclusion is, that the constitution of Ohio, whether it is to be regarded as the expression of the sovereign will of the people, that the extraordinary exemptions granted to these corporations, by which they contribute unequally to the public support, is contrary to the genius of their institutions; or whether they are inconsistent with a just apportionment of the public burdens; or whether, as a declaration of the exigency of the State, requiring an additional contribution from them to its revenue; or a judgment of condemnation of the former government for an abuse of the powers it enjoyed; that it is above and beyond the supervision or control of the judiciary department of this government.

Nor does the opinion, that this department can exert such an empire over the people of Ohio, derive support, in my opinion, from the clause in the constitution on the subject of the obligation of contracts, nor the decisions of this court upon that clause of the constitution.

That the people of the States should have released their powers over the artificial bodies which originate under the legislation of their representatives, or over the improvident charges or concessions imposed by them upon its revenues, or over the acts of their own functionaries, is not to be assumed. Such a surrender was not essential to any policy of the Union, nor required by any confederate obligation. Such an abandonment could have served no other interest than that of the corporations, or individuals who might profit by the legislative acts themselves. Combinations of classes in society, united by the bond of a corporate spirit, for the accumulation of power, influence, or wealth, by the control of intercourse or trade, or the spiritual or moral concerns of society, unquestionably desire limitations upon the sovereignty

32 *

of the people, and the existence of an authority upon which they can repose in security and confidence. But the framers of the constitution were imbued with no desire to call into existence such combinations, nor dread of the sovereignty of the people. They denied to congress the power to create, (3 Mad. Deb. 1576,) and the most salutary jealousy was expressed in reference to them. The people of the States, during the existence of the confederation, suffered from the violation of private property by their governments. In reconstituting their political system, they abstained from delegating to the United States the powers to emit bills of credit; to make any thing but gold and silver a tender in the payment of debts; to pass any bill of attainder or *ex post facto* law, or law to impair the obligation of contracts, except so far as necessary to a uniform law of bankruptcy; while they protected property from unreasonable searches and seizures, and the title from detriment, except in the due course of legal proceeding.

The state governments were prohibited from any corresponding legislation, either by their federal or state constitutions.

The power to interfere with private contracts is one of the most delicate and difficult, in its exercise, of any belonging to the social system, and one which there is constant temptation to abuse. That its exercise is sometimes necessary is proved by the history of every civilized State. Its judicious exercise constitutes the titles of Solon and Sully to fame, and has been vindicated by the most enlightened statesmen. But the people reserved to themselves to determine the exigencies which should call it into existence. The prohibition is a limitation upon the ordinary government, and not upon the popular sovereignty. In Fletcher v. Peck, 6 Cr. 87, the chief justice doubted whether the repeal of a grant, issued under a legislative act by the executive of a State, was within the competence of the legislative authority; and notices the distinction between acts of legislation and sovereignty, and treats the clause of the constitution under consideration as an inhibition on legislation. In Dartmouth College v. Woodward, 4 Wheat. 518, 553, Mr. Webster presents the distinction with prominence in his argument. He says: "It is not too much to assert that the legislature of New Hampshire would not have been competent to pass the acts in question, and make them binding on the plaintiffs, without their assent, even if there had been in the constitution of the United States, or of New Hampshire, no special restriction on their power, because these acts are not the exercise of a power properly legislative. * * * * The British Parliament could not have annulled or revoked this grant as an ordinary act of legislation. If it had done it at all, it could only have been in virtue of that sovereign power

Dodge v. Woolsey.

called omnipotent, which does not belong to any legislature of the United States. The legislature of New Hampshire has the same power over the charter which belonged to the king who granted it, and no more. By the law of England, the power to grant corporations is a part of the royal prerogative. By the revolution, this power may be considered as having devolved on the legislature of the State, and it has been accordingly exercised by the legislature. But the king cannot abolish a corporation, or new-model it, or alter its powers, without its assent." * * *

Chief Justice Marshall, in describing the jurisdiction of the court over such contracts, says, it belongs to it "the duty of protecting from legislative violation those contracts which the constitution of the country has placed beyond legislative control." And, in defining the object and extent of the prohibition, he says: "Before the formation of the constitution, a course of legislation had prevailed in many, if not in all the States, which weakened the confidence of man in man, and embarrassed all transactions between individuals by dispensing with a faithful performance of engagements. To correct this mischief by restraining the power which produced it, the state legislatures were forbidden to pass any law impairing the obligation of contracts; that is, of contracts respecting property under which some individual could claim a right to something beneficial to himself." These selections from opinions delivered in this court which have carried the prerogative jurisdiction of the court to its farthest limit, and portions of which are not easily reconciled with a long series of cases subsequently decided, (Satterlee v. Matthewson, 2 Pet. 380; Charles River Bridge, 11 Pet. 420; West River Bridge v. Dix, 6 How. 507; 8 How. 569, 10 How. 511,) show with clearness that this court has not, till now, impugned the sovereignty of the people of a State over these artificial bodies called into existence by their own legislatures.

I have thus given the reasons for the opinion that the constitution of Ohio and the acts of her government, done by its special authority and direction, are valid dispositions. It is no part of my jurisdiction to inquire whether these public acts of the people and the State were just or equitable. Those questions belong entirely to themselves.

It may be that the people may abuse the powers with which they are invested, and, even in correcting the abuses of their government, may not in every case act with wisdom and circumspection.

But, for my part, when I consider the justice, moderation, the restraints upon arbitrary power, the stability of social order, the security of personal rights, and general harmony which existed in the country before the sovereignty of governments was as-

serted, and when the sovereignty of the people was a living and operative principle, and governments were administered subject to the limitations and with reference to the specific ends for which they were organized; and their members recognized their responsibility and dependence, I feel no anxiety nor apprehension in leaving to the people of Ohio a "complete power" over their government, and all the institutions and establishments it has called into existence. My conclusion is, that the decree of the circuit court of Ohio is erroneous, and that the judgment of this court should be to reverse that decree and to dismiss the bill of the plaintiff.

Mr. Justice DANIEL:
"I concur entirely in the preceding opinion of my brother Campbell.

Mr. Justice CATRON:
" I also dissent, and concur with the conclusions of the opinion just read."