THE LEHIGH VALLEY RAILROAD COMPANY and THE MORRIS CANAL AND BANKING COMPANY

*v.*

HENRY McFARLAN and others.

1. The charter of the Morris Canal and Banking Company was granted in 1824. By the constitution of this state, in existence at that time, it was competent for the legislature to authorize the taking of the property of private individuals for public uses, without compensation first made.

2. The charter of the company is irrepealable, and created a contract which is incapable of alteration or repeal by the legislature, except by mutual consent, and is, therefore, unaffected by the constitution of 1844, which forbids the taking of property by private corporations for public use, without compensation first made. The company's charter, and the powers and privileges therein granted, continue, notwithstanding the change of policy adopted by the constitution of 1844, and possess equal vitality with respect to acts done by the company under it, after the constitution of 1844 became the fundamental law, as if done before the adoption of that instrument.

3. A state constitution is a law within the meaning of that clause of the constitution of the United States which ordains that "no state shall pass any law impairing the obligation of contracts."

4. By its charter it is made lawful for the company to enter upon, take possession of, and use such lands, waters and streams as are necessary for its canal, without compensation first made. The title to lands taken, and the right to waters and streams appropriated, do not finally vest in the company until compensation be made; but, nevertheless, the occupation and use thereof, by the company, are made lawful, though compensation therefor has not been ascertained or paid.

Lehigh Valley R. R. Co. *v.* McFarlan.

5. The twentieth section of the company's charter, construed in connection with the twenty-seventh section, gives to persons injured a right of action against the company for damages to water rights as well as to lands, tenements and hereditaments, whether the damages sustained be direct or consequential, and whether they arose from the construction of the canal in the first instance, or from the subsequent operations of the company.

6. The only redress for the owner of lands or water rights, which are taken or injuriously affected by the construction or operation of the canal without compensation having been made, is by action for damages. He cannot remove the company from the premises by ejectment, or abate the company's works as a nuisance, though compensation has not been made for his injuries.

7. The Morris canal enters into and crosses the Rockaway river at Dover. The crossing is effected by means of a dam in the river, which holds the water, at the place of crossing, at a height suitable to carry boats across the river, and to supply a head of water in the lower level of the canal. M. is the owner of a mill, situate on the river, and driven by its waters, a short distance above the place where the canal crosses the river. In 1845, the company placed flash-boards on top of its dam, attached by means of iron pins, to be used during the boating season for the purpose of increasing the height of water in its dam and in the lower level of the canal. The effect of the use of the flash-boards is to throw the water back on the wheel of the mill, so as to interfere with its use. M. removed the flash-boards. On bill filed by the company for an injunction,—*Held*, that the company had a right, by its charter, to appropriate the waters of the river to its use, for its canal, without compensation first made to persons injured; and that, the use of flash-boards for that purpose being lawful, M. had no right to remove them, but must resort to an action for damages.

---

On appeal from a decree of the vice-chancellor, whose opinion may be found in *Lehigh Valley R. R. Co.* v. *McFarlan, 3 Stew. 180.*

*Mr. F. T. Frelinghuysen,* for appellants.

I. The canal company claims the open, continuous and adverse enjoyment of the dam, with flash-boards eight inches wide, and all the consequences thereof, for more than twenty years, as conclusive evidence of a grant therefor.

When one raised the water in his pond to the height of his dam, whenever the water was high enough in the stream, and continued this more than twenty years, under a claim of right, it is held that the height of the dam fixes the extent of his easement or right of flowing, although at times the water in the pond was below the top of the dam. *Washb. on Eas.* *103, *105, *106 ; *Winnepiseogee Co.* v. *Young, 4 N. H. 436.*

"Rights to an easement, acquired by long possession, ought to stand on the same ground as rights by possession in land. The real principle underlying the right, is the same precisely on which the statute of limitation stands." *Washb. on Eas.* *72 ; *Tracy* v. *Atherton, 36 Vt. 503.*

Justice Depue, in *Horner* v. *Stillwell, 6 Vr. 314,* says: "The evidence of title to an incorporeal hereditament, and of the transfer of it, is governed by the same principles which apply to other real estate," and quotes many authorities. *Earl* v. *De Hart, 1 Beas. 281.* In that case it was the easements of a ditch to carry off rain and melted snow. The tenant occasionally stopped the ditch, but it was immediately opened. *Shield* v. *Arndt, 3 Gr. Ch. 235.*

"An exclusive enjoyment of water, or of light, or of any other easement, in any particular way, for twenty years, without interruption, becomes an adverse enjoyment sufficient to raise a presumption of title as against a right in any other person which might have been, but was not, asserted." *Shreve* v. *Voorhees, 2 Gr. Ch. 25.*

(1) The use was adverse, that is, was enjoyed while claiming the right to the use, and not by license or permission.

It is an important circumstance in determining whether the user of the right claimed is adverse or not—that it is contrary to the interest of the owner. It is contrary to his interest to have back-water on his wheel. *Washb. on Eas.* 125 ; *Arnold* v. *Stevens, 24 Pick. 106.*

Again, it is an adverse assertion of right to do that which would expose the party to an action. *Fellows* v. *Simpson, 11 Ind. 84 ; Urbane* v. *Patrick, 1 Jones (N. C.) 23.*

Lehigh Valley R. R. Co. *v.* McFarlan.

(2) Mr. McFarlan acquiesced. This is the point that the vice-chancellor relies upon and quotes.

Whenever, and only when an officer of a corporation, acting within the range of his authority, can bind the company, notice to him is notice to the company. *Wharton's Com. on Agency* §§ *183, 184; Taunton Bank* v. *Woodruff, 1 Gr. Ch. 117; Mechanics Bank* v. *Seton, 1 Pet. 199; Tyman* v. *Bank, 12 How. 225; Housatonic Bank* v. *Mathier, 1 Metc. (Mass.) 294.*

A principal is not bound by a notice to an agent acting out of his special sphere. *Fuller* v. *Bennett, 2 Hare 402; Hurin* v. *Mill, 13 Ves. 120; Lawrence* v. *Tucker, 7 Greenl. 195.* He acquiesced. I submit the law is, as before stated, and as held by *Washburn, p. 146* : "If the owner of a dam, or his predecessors, have, in fact, enjoyed and exercised the right of keeping up his dam and flowing the land of another, for a period of twenty years, without paying damages therefor, or any claim or assertion of a right to damages for such flowing, it is, in itself, evidence of a prescriptive right to continue such flowing." *Williams* v. *Nelson, 23 Pick. 141; Perrin* v. *Garfield, 37 Vt. 310; Brace* v. *Yale, 10 Allen 443.*

II. The canal company claim a charter title to the dam and flash-boards, obtained by the exercise of the power of eminent domain, the enjoyment of which for more than twenty years, whether with or without the acquiescence of Mr. McFarlan, renders that title, were it defective, perfect, and shows that Mr. McFarlan has received the statutory compensation for such title.

The Morris Canal and Banking Company was incorporated December 31st, 1824 (*P. L. 1824 p. 158*). The constitution then existing was adopted July 2d, 1776 (*Elmer's Dig.*), and contains no provision like that of our present constitution, adopted June 29th, 1844, which, by Art. 4, Sec. 7, pl. 9, ordains that "individuals or private corporations shall not be authorized to take private property for public use, without just compensation *first* made to the owner."

The fifth section of the charter gives the authority to make the canal with its works, and gives the company, with its agents, authority, from time to time, to enter upon lands, whether covered with water òr not, for the purpose of surveying the route or routes for the said canal and locating the works.     And when the route shall have been fixed upon, which is to be evidenced by depositing a survey thereof in the office of the secretary of state, then it shall be lawful for the company " at any time to enter upon and *take possession of and use* all and singular such *lands, waters* and streams, *subject* to such *compensation,* to be made *therefor* as is *hereafter directed."*

This fifth section does not require the quantity of land to be stated, or the height of the dam fixed.     The rule was different in *Vail* v. *Morris & Essex R. R. Co.,* 1 *Zab. 189,* and the supreme court, in *Den* v. *Morris Canal and Banking Company, 4 Zab. 591,* calls attention to this distinction.     *Kough* v. *Darcy,'6 Hal. 284; Den* v. *Morris Canal and Banking Company, 4 Zab. 589.*

The court approves the construction thus given the charter of the Morris Canal and Banking Company, in *Hetfield* v. *The Central Railroad Company of New Jersey, 5 Dutch. 575.*     The suit provided for in Sec. 20 being for compensation, covers all, direct and indirect, immediate and consequential, injury, whether by actual compensation or remote deterioration.     It covers the back-water on McFarlan's wheel.     It comes in the place of an assessment, and the damages covered are as extensive.     *Van Schoick* v. *Del. & R. Canal Co., Spen. 253.*

(2) The canal company has a charter title to the dam at *its present height,* under the power of eminent domain, and it matters not on this point whether the eight inches were added in 1845 or in 1857, for the charter title of the company accrued at once, whenever it was.

The dam was raised by the company in the exercise of a charter right, and is, as raised, a lawful structure and not a nuisance.

Lehigh Valley R. R. Co. *v.* McFarlan.

(3) The raising of the dam in question is a raising of eight inches; that is the addition he says was on in June, 1875; that is what he says he took off; that is what the company spiked on again. It is the eight inches that the decree of the chancellor justifies Mr. McFarlan in having taken off and in keeping off. I submit that the evidence before referred to, proves, beyond a doubt, that the raising of the dam was, in 1845, as an incident to the enlarged capacity of the canal. The company, in this view, sets up no lost grant, but a charter title, and the thirty years user of the dam, with the flash-boards on, claiming under this title, even were it defective, makes it perfect. A corporation in New York has no capacity to take under the statute of wills, yet the lapse of twenty years renders the title of the corporation perfect. *Harpending* v. *Dutch Church, 16 Pet. 455.*

III. If McFarlan had not been a director, and if the charter of the Morris canal was not peculiar, on the authority of *Trenton Water Power* v. *Chambers, 1 Stock. 471,* McFarlan could have no claim, except for compensation.

IV. But if the views taken are erroneous, I submit that the decree in this case should not be affirmed, for three reasons :

(1) Because McFarlan filed a cross-bill, in which he prayed that the height to which the canal company had raised the dam by fastening scantling to the string-pieces might be ascertained by the court. To that bill an answer is filed, setting up new equities against McFarlan. The court has not found out, as McFarlan asks, how much the dam has been raised, but says to McFarlan, "you were right in cutting it down eight inches; go and do it again." It is true the dam may not have been raised two inches by the eight-inch scantling, as, it being fifty years old, it may have greatly settled. We think the decree authorizing McFarlan to cut down the dam eight inches, and thus destroy a public

work, should be reversed, at all events until the issue formed by both parties is determined.

(2) One has no right to abate a nuisance and thereby damage those who are innocent of the nuisance. *Amick* v. *Pratt, 13 Gratt. 567.* The owners of the scores of boats loaded with merchandise were, by reason of Mr. McFarlan's taking down the dam, detained, and they were innocent of the nuisance, and he committed a nuisance in the abatement.

(3) The court, we think, should not justify a willful injuring of the canal or works connected therewith. The thirteenth section of the charter of the company enacts that if any person shall, in any manner, willfully (that is, by design and with set purpose) or maliciously injure said canal, or any of its parts or works therewith connected, he shall be held guilty of a misdemeanor. Mr. McFarlan three times, in a few days, ordered the plank to be cut away. This damaged the company a thousand dollars a day, and the citizens of the state vastly more.

There is authority to sustain the position, that when one has forborne to abate a nuisance which is a private structure, for many years, though less than twenty, his right to abate *vi et armis* is gone. *Moffit* v. *Brewer, 1 Greene (Iowa) 348.* But our public works, railroads and canals, because the whole community are interested in them, have a much higher sanctity

*Messrs. McCarter & Keen,* for appellants.

I. The defence set up by the defendant's answer in this case, viz., that the flash-boards were never placed on the dam by the canal company until 1857, totally fails.

II. The evidence on both sides shows, and the vice-chancellor finds as a fact, that the use of the flash-boards commenced in 1845, at the time the canal was widened and deepened throughout its whole length, and continued every year, during the summer, from 1845 to 1875.

III.   The canal company, by the provisions of its charter, acquired the right to use and maintain the flash-boards as a part of the dam, by the exercise of the right of eminent domain.    *Charter of Canal Co., P. L. 1824 p. 160 § 5; Kough* v. *Darcey, 6 Hal. 237; Den* v. *Canal Co., 4 Zab. 587.*

IV.   The canal company acquired the right to use the flash-boards by an open, notorious, uninterrupted and adverse user for more than twenty years.    *Earl* v. *DeHart, 1 Beas. 280; Stuyvesant* v. *Woodruff, 1 Zab. 133, 139, 154; Shields* v. *Arndt, 3 Gr. Ch. 224, 246; Shreve* v. *Voorhees, 2 Gr. Ch. 25, 32; Veghte* v. *Raritan Water Power Co., 4 C. E. Gr. 142, 155.*

V.   The rule acted upon by the vice-chancellor, that verbal remonstrances or denials of the right which would otherwise be acquired by the user, is sufficient to defeat the right and destroy the effect of the user, has never been adopted in New Jersey, and is no longer law anywhere. On the contrary, it is well settled that the law governing the acquisition of title to incorporeal hereditaments by user, rests on the same principles which apply to adverse possession of real estate corporeal.    *Horner* v. *Stillwell, 6 Vr. 307, 312; Cobb* v. *Davenport, 3 Vr. 369, 386; Society* v. *Holsman, 1 Hal. Ch. 126; 3 Starkie's Ev. 1216–17; 1 Green-leaf's Ev. p. 22 § 17; 2 Greenleaf's Ev. p. 497 § 545; Id. 491 § 539; Angell on Limitations p. 3 ch. 1 § 4; Den* v. *Mul-ford, 1 Zab. 506; Den* v. *Morris, 2 Hal. 6; Eldridge* v. *Knott, Cowp. 215; Knight* v. *Halsey, 2 Bos. & Pull. 206; Roe* v. *Ireland, 11 East 280; Holcroft* v. *Heel, 1 Bos. & Pull. 400; 3 Kent Com. 446; Tyler* v. *Wilkinson, 4 Mason 402; Coe* v. *Wolcottville Mfg. Co., 35 Conn. 175; Statutes of Conn., Limitations, p. 551, title 39 § 1; Sumner* v. *Child, 2 Conn. 628; 2 Wait's Actions and Defences 685; Bright* v. *Walker, 1 C. M. & R. 217, 219; Cornelius* v. *Empson, 1 Dutch. 31; Den* v. *Hunt, Spen. 491; Brian* v. *Atwater, 5 Day 188; French* v. *Pearce, 8 Conn. 439; Stillman* v. *White Rock Mfg. Co., 3 Woodb. & M. 538; Levitt* v. *Wilson, 3 Bing. 115;*

*Eaton* v. *Swansea Water Works*, *17 Q. B. 267; Bowell* v. *Bagg, 8 Gray 441; Sibley* v. *Ball, 11 Gray 417; Nichols* v. *Naylor, 7 Leigh 546; Hall* v. *Augsbury, 46 N. Y. 622.*

VI. The circumstances proved in the case show that McFarlan is equitably estopped from interfering with the company's use of the flash-boards by forcible means or otherwise. *Kerr on Injunctions, 201, 202, 203; Greenhalgh* v. *Manchester R. R., 3 Myl. & Cr. 784; Williams* v. *Earl of Jersey, 1 Cr. & Ph. 91; M. & E. R. R. Co.* v. *Pruden, 5 C. E. Gr. 541; Trenton Water Power Co.* v. *Chambers, 1 Stock. 471; Erie Railway Co.* v. *D. L. & W. R. R. Co.. 6 C. E. Gr. 283.*

VII. When the defence set up in defendant's answer fails, and he places his defence on other grounds than those stated in his answer, such equitable estoppel may be invoked to rebut such defence, although the circumstances out of which it arises are not stated in the bill.

VIII. In any event, under the charter of the company, and the authorities cited under point III, the remedy of defendant, if he has any, is not by a forcible abatement of the canal, or that portion of it which causes him an injury. *L. V. R. R. Co.* v. *Society, 3 Stew. 145; Charter of Canal Co., P. L. 1824 p. 165 § 13; P. L. 1872 p. 146.*

*Mr. H. C. Pitney*, for defendants.

The single issue presented by the pleadings is, has or has not, the complainant the legal right, as against the defendant, as riparian proprietor, to maintain that part of the dam which was abated? That the dam, in its present condition, is a nuisance to the defendant, is not denied, and the right to abate it is indisputable, unless the complainant has the right to maintain it. This is the issue, and the burthen of maintaining it is on the complainant. In sustaining it, the *probata* must correspond with the *allegata*. This is a rule adhered to with wise tenacity in this court.

*Smith* v. *Axtell, Sax. 494; Parsons* v. *Heston, 3 Stock. 155; Marsh* v. *Mitchel, 11 C. E. Gr. 497; Brantingham* v. *Brantingham, 1 Beas. 160; Hopper* v. *Sisco, 1 Hal. Ch. 343; Howell* v. *Sebring, 1 McCart. 84.*

I. The right in question is called *easement of flowage.* Defendant does not complain of the dam as a structure, except so far as it affects him, and the right claimed by the complainants is not so much to maintain the dam as a structure, as to make such use of it as to pen back the water and obstruct its flow on defendant's land. Now, *easements* acquired by adverse user rest on the idea of a *lost grant.* All easements are properly said to lie in *grant.* They are incorporeal and incapable of livery of seizin. *Gale & Whatly,* *18; *Washburn* *18; *Co Lit. 9a.*

In New Jersey, as a matter of pleading in the common law courts, the right must be pleaded as having had its origin in a grant which has been lost. A pleading setting up an easement acquired by prescription, in New Jersey is bad. It has been held that there can be no such thing, strictly speaking, as prescription here. It results from this rule that the user relied upon *must be precisely such in its character as it would have been if it had been enjoyed under an actual grant.* That is, the enjoyment must be in all respects such as a person having an absolute right would have had. This is fundamental, and must be borne in mind. See, generally, *Washb. on Eas. 65, et seq.; Gale & Whatly on Eas. 86, et seq.*

The inquiry, then, is, as to the *character, extent* and *continuance* of the issue relied on.

(1) As to *character*—Was it *adverse* and *continuous?*

(2) As to *extent*—How much? how was the water maintained? for how much of the time? all the year, or parts only? steadily, or occasionally?

(3) As to its *continuance*—For how long a time? for twenty years, or less?

First—then, as to the character of the user relied on. Was it *adverse* and *continuous?* " In order that the enjoyment which is the *quasi*-possession of an easement, may con-

fer a right to it by length of time, it must have been *open, peaceable* and *as of right.*" *Gale & Whatly* \*121, et seq.

The language of Bracton is: " *Longus usus, nec per vim, nec clam, nec precario* "—" *per patientiam veri domini, qui scivit et non prohibuit sed permisit de consensu tacito.*" (*Putnam* v. *Ballard, 9 Pick. 251–254.*) That is—*Long* (more than twenty years), *without force or contention, openly and not secretly, and not by permission asked and granted,* but *as of right.* *Gale & Whatly* \*122, 123 ; *Tickle* v. *Brown, 4 Ad. & El. 369 ; Goddard on Eas. 121–128 ; Washb. on Eas.* \*86, \*112.

The difference between corporeal and incorporeal rights, in respect of capacity of being the subjects of actual and exclusive possession, is radical and important. At the common law a man might have and enjoy actual title to land without any written evidence of it, resting alone on his seizin. But it was not so with incorporeal rights, not the subject of seizin, and for which a grant was absolutely necessary. So that the actual loss of the grant might, and, in the absence of competent proof of its once existing, probably would, result in the loss of the right itself. A mere verbal inhibition is sufficient. "At the common law," says Mr. Gale, " any acts of interruption or *opposition,* from which a jury might infer that the enjoyment was not rightful, were sufficient to defeat the effect of the enjoyment, the question being, whether, under all the facts of the case, such enjoyment had been under a *concession of right ;*" and, again : " By the civil law, any enjoyment was said to be forcible to which opposition was offered either by *word* or deed by the owner of the servient tenement." As before remarked, *acquiescence* of the owner in the enjoyment is essential, and anything which disproves acquiescence defeats the accruing of the right. *Powell* v. *Bragg, 8 Grey 441 ; Eaton* v. *Swansea Water Works, 17 Ad. & El.* (*N. S.*) *267 ; Stillman* v. *Man. Co., 3 Woodb. & M. 538 ; Livett* v. *Wilson, 3 Bing. 115 ; Bright* v. *Walker, 1 Cromp. M. & R. 219 ; Cuthbert* v. *Lawton, 3 McCord 195 ; Nichols* v. *Naylor, 7 Leigh 565 ; Olney* v.

*Gardner, 4 M. & W. 500.* The cases in *8 Grey, 3 Woodb. & M.*, and *7 Leigh*, are much in point. *Washb. Eas. *112.*

The distinction between adverse *occupation* or *possession* of land and adverse *user* of an *easement*, is clearly shown in *Powell* v. *Bragg.* Nobody pretends that twenty years adverse possession passes the title. Its effect is only, under the statute, to bar the remedy. So, a single act of interruption during the running of the twenty years, is sufficient to defeat the acquisition of the easement. *Tickle* v. *Brown, 4 Ad. & El. 369; Livett* v. *Wilson, 3 Bing. 115; Carlile* v. *Cooper, 4 C. E. Gr. 256, 260–263; Sumner* v. *Tileston, 7 Pick. 198.* Further, the user must have been without force, under an open claim of right, and not by permission asked and obtained.

Now apply these principles to the case in hand.

(*a*) The right to use flash-boards has always been denied, and their use forbidden, resisted, interrupted on our part, and not even claimed—at least until within a few years—to be of right by the other side.

(*b*) The use was always, up to a very recent date, either by *permission* asked and granted, or by *force*, either *precario* or *per vim.*

Second—As to the extent of the user.

The measure of the right in these cases is the height to which the water has been kept, continuously, during the required time; not the height of the *dam*, but of the water. The measure of the right is the extent of the adverse use. *Carlile* v. *Cooper, 2 C. E. Gr. 526; 4 C. E. Gr. 256; 6 C. E. Gr. 576.*

Now, how high did the water stand, years ago, in the river and in the four-mile level? On these points we have a variety of evidence. We will commence, as the complainants did in proving their case, with the four-mile level.

(1) Here we have a piece of timber laid horizontally in the stone abutment at the end of the lock, and on the north or berme bank of the canal, now eight inches below the surface of the water, placed there for the purpose of nailing

rubbing-plank or sheathing. Naturally, one would sup-pose that this timber or string-piece was originally placed above the water.

(2) Then we have the general increase in the height of the water in the canal, and in the tonnage of the boats.

(3) The actual increase in the height of the dam. The evidence is clear that, previous to the enlargement of the canal, the dam consisted of the same stone work now there, with a single stick of timber on it from six to eight inches wide. It had settled toward the north end, and a hollow place had formed, where the water all passed, in low stages.

Third—There remains to be considered, the length of time of the user. This point has been mostly anticipated. The flash-boards were first used in connection with the larger boats used after the enlargement of the canal, which occurred between 1845 and 1850. As before shown, and as appears by the height to which the water was kept in the four-mile level previous to 1857, the combined height of the permanent structure and flash-boards before 1857, was not greater than the permanent structure alone after 1857. But, as before shown, their use was always precarious and greatly interrupted. Then we have the marked increase in 1857, which, of course, is within twenty years of the abate-ment of the dam. Then we have the decided interruptions proved by Mr. Hinchman and Mr. Talcott. So that there is no actual use for twenty years, even if it had the requisite qualities to make it available for complainants.

II. The mere fact that a director of a railroad or a canal company is cognizant of, and, if you will, acquiesces in, plans of construction which include the appropriation of a part of his property, does not preclude him from claiming compensation for his property so taken, and from pursuing all legal remedies for that purpose. No proof, however, of anything of the kind is here shown against McFarlan. The mere fact of his being a director does not prove it. There is no proof of any plan being adopted which included the raising of the dam.

The widening and *deepening* of the canal did not necessarily include the *raising* of the dam, though it might the deepening of the bed of the river at the crossing. The history of the use of the flash-boards disproved any settled plan which included them as a permanent part of the canal.

The right given by the fifth and sixth sections of the charter to enter and occupy, without first making compensation, reserving by the twentieth section their rights of action to all parties aggrieved, does not include the right,. years after the first right of entry has been exercised and the works erected, to do what has been done here—add to the height of a structure once fixed, and thereby ruin valuable private property. The reading of those sections will not bear any such construction. Creating and maintaining a nuisance like that in question here, was not contemplated by those sections.

McFarlan, having arranged his machinery to suit the dam as originally fixed, the canal company are estopped from claiming under their charter any peculiar immunities against the common law right of abatement. But, admitting, for argument's sake, that such immunity may exist, yet it cannot avail the complainant here, for several reasons:

First—No such case is made by the bill. As before shown, complainants put themselves upon a *legal* right to maintain the dam acquired by condemnation proceedings, and also by adverse use for more than twenty years.

Second—They cannot, if the right to maintain at the increased height has not been acquired, ask a court of equity to protect them in the enjoyment of a structure which injures another, unless they, at the same time, offer to make compensation.

Admitting, for argument's sake, and for that only, that, by the strict letter of your charter, you have the right in law to maintain the dam at any height without making, or offering to make, any compensation, yet it is contrary to the spirit and equity of the statute for you so to do, and equity will

not uphold you in so doing, nor aid you in persisting in so doing.

To enjoy a man's property against his will and without making him compensation, is contrary to the very first principles of justice, to say nothing of equity, and so I go further, and say that, though it may be illegal, it is not inequitable for me, under the circumstances, to compel you to do me justice by abating the injurious structure. · These principles are fundamental. *1 Story's Eq. Jur.* § *64e*, and cases cited. *Willard's Eq. p. 46*, and cases cited. *Comstock* v. *Johnson*, *46 N. Y. 615 ; Sturgis* v. *Champneys, 5 M. & C. 97 ; Trenton Water Power Co.* v. *Chambers, 1 Stock. 471 ; Central Railroad* v. *Hetfield, 3 C. E. Gr. 323.*

The opinion of the court was delivered by

DEPUE, J.

The Morris Canal and Banking Company was incorporated by an act of the legislature, passed on the 1st of December, 1824, and was authorized to construct a canal to unite the river Delaware, near Easton, with the tide-waters of the Passaic (*P. L. 1824 p. 158*). By the act of January 26th, 1828, the company was empowered to extend its canal to the waters of the Hudson, at or near Jersey City (*P. L. 1828 p. 34*). In 1845, the canal was enlarged to provide for its navigation with boats of greater capacity. In 1871, the canal, its property, works and franchises were granted by a perpetual lease to the Lehigh Valley Railroad Company, under the authority of the legislature of this state (*P. L. 1871 p. 444*).

The canal was constructed from the Delaware to the Passaic, in 1828, and extended to Jersey City in 1830. The summit level of the canal is in the county of Morris, near Lake Hopatcong, and from that source, water for the supply of the eastern division of the canal is mainly obtained. East of the summit level, the canal enters the valley of the Rockaway, and, at Dover, in the county of Morris, it crosses

the Rockaway river.   The crossing of the river is effected by means of a lift-lock, which discharges the waters from the upper level of the canal into the river, and a guard-lock on the opposite side of the river, through which the water flows into the lower level of the canal; and, also, a dam across the river, which holds the water at the place of crossing, where the waters of the canal and those of the river are commingled, to a height suitable for the purpose of carrying boats across the river and supplying a head of water upon the lower level, called, in the pleadings, "the four-mile level."   The original dam is a substantial, permanent structure, and was erected about the year 1828.   In 1845, when the canal was enlarged, the company placed on the top of the dam, planks or flash-boards, attached by means of iron pins, so as to be capable of being put on or taken off, at pleasure, that they might be used or dispensed with, as occasion might require.

McFarlan is the owner of a rolling-mill and iron-works, situate on the Rockaway river, a short distance above the place where the canal crosses the river.   His works are driven by the waters of the Rockaway, taken from the river a few hundred feet above the intersection of the canal with the river, and discharged again into the river above that point.

The defendants do not deny the complainants' right to maintain that part of the dam which is permanent.   The controversy relates solely to the maintenance of flash-boards on the permanent structure during the boating season, for the purpose of keeping the water to the requisite height in the level eastward of the guard-lock, and it is undisputed that when the flash-boards are on, and the dam full, the water is thrown back on the wheel of the rolling-mill in such a manner as greatly to interfere with its use.

In June, 1875, McFarlan leased the rolling-mill to Wynkorp & O'Conner, for the term of two years.   The tenants, finding the use of the water-wheel of the mill impeded by the back-water, on the 26th of July, by the direction of

McFarlan, removed the flash-boards from the company's dam. The flash-boards having been immediately replaced, the defendant, on the next day, again removed them. Thereupon, this bill was filed for an injunction to restrain the defendants from interfering with the complainants in rebuilding and maintaining the said dam, with the flash-boards thereon. A temporary injunction was granted, and, on final hearing, on the advisory opinion of the vice-chancellor, the injunction was dissolved, and the bill dismissed, from which decree this appeal was taken.

The complainants rest their prayer for relief on a claim of a right to increase the height of their dam during the navigation season, by the addition of flash-boards eight inches in width. On the argument, it was sought to deduce this right from several considerations.

The complainants invoke the doctrine of equitable estoppel from the long acquiescence by McFarlan in the use of the flash-boards, and the fact that he was a director of the canal company when its lease was made to the other complainant.

The complainants also set up a right in themselves to hold the water at the height at which it will be held by flash-boards, and to flood the lands of McFarlan to that extent, by prescription arising from a use of more than twenty years.

I do not deem it necessary to examine either of these grounds for relief, inasmuch as, in the judgment of this court, the decision of this case should be placed on another and a distinct ground, founded on the rights of the canal company under its charter.

The charter of the company was granted in 1824. By the constitution of this state, in existence at that time, it was competent for the legislature to authorize the taking of the property of private individuals for public uses without compensation first made. *Den* v. *Morris Canal Co., 4 Zab. 587.* This charter is irrepealable, and created a contract which is incapable of alteration or repeal by the legislature,

except by mutual consent. In fact, no effort has ever been made to effect any change in it in the respects which are material to the present case. It is unaffected by the provision of the constitution of 1844, which interdicts the taking of property by private corporations for public use without compensation first made. *Const. 1844, Art. IV, § VII, ¶ 9.* A state constitution is a law within the meaning of that clause of the constitution of the United States which ordains that " no state shall pass any law impairing the obligation of contracts." *Dodge* v. *Woolsey, 18 How. 331; R. R. Co.* v. *McClure, 10 Wall. 511.* The company's charter, and the powers and privileges therein granted, continue, notwithstanding the change of policy adopted by the constitution of 1844, and possess equal vitality with respect to acts done by the company under it after the constitution of 1844 became the fundamental law, as if done before the adoption of that instrument.

That the charter of this company authorizes the taking and appropriation of property of private individuals for its use, at the will of the company, and without compensation therefor first made, seems to me to be too clear for successful denial.

The fifth section of the act authorizes the company to construct a canal or artificial navigation, to connect the waters of the Delaware river, near Easton, with the tide-waters of the Passaic river, with all the locks and works necessary for the use of said canal. It further provides that it should be lawful for the said company to enter, from time to time, and upon all times, upon all lands, whether covered with water or not, for the purpose of exploring or surveying the route or routes of said canal, and locating the several works, as above specified, doing thereunto no unnecessary damage; and when the said route or routes shall have been fixed upon, and its several works located by its president or directors, or a majority of them, and a survey thereof deposited in the office of the secretary of state, it should be lawful for them, and for any agent,

superintendent, engineer, contractor, or any person or persons employed in the service of said corporation, at any time, to enter upon, take possession of, and use all and singular such lands, waters and streams, subject to such compensation to be made therefor as is thereinafter directed.

By the sixth section it was enacted that, where lands, waters and streams, that may be useful for such canal, shall not be made a free gift by their owner or owners, to the said company, then the company shall pay to the owner or owners such compensation as shall be mutually agreed upon; and, in case of disagreement in relation to the value of such lands, waters and streams, it should be lawful to and for the aforesaid president and directors, from time to time, and at all times, to cause a survey or surveys, and map or maps, to be made of any of the lands, waters and streams in their estimation requisite, and not given as aforesaid, and which they are authorized by this act to take for the uses aforesaid, and to exhibit the same to one of the justices of the supreme court of this state, who is required to appoint appraisers, whose duty it was made, if requested so to do, by the owner or owners or by the company, to make a just and equitable estimate and appraisal of the value of the lands and damages to the several owners, proprietors or parties interested in the premises so required for the purposes aforesaid; and it was provided that the company shall pay or tender the damages so assessed, to the person or persons entitled thereto, and immediately thereupon the estate, right, property and interest in and to the premises so appropriated, described and appraised, should be vested in the company, to be by them held so long as they shall be used for the purposes of said canal.

The twentieth section provides that nothing in the act should be taken to impair the right of any person to an action against the said company, for damages to his or her water rights, lands, tenements or hereditaments, by the erection of said canal, where such person hath not been agreed with by the said company, or his or her damages,

right and estate satisfied and vested in the said company, under the previous provisions of the act; and the twenty-seventh section enacts that the twentieth section should be so construed as to extend to the damages sustained by the subsequent operations of the company, from time to time, as the same may arise.

By force of these charter powers, the entry upon, occupation of and use of lands, and the appropriation of waters necessary for the use of the canal, as from time to time may be determined upon by the company, is made lawful. The title to lands so taken, and the right to the waters so appropriated, do not finally vest in the company, until compensation be made; but, nevertheless, the occupation and use thereof are lawful, leaving the damages sustained by the injured parties to be recovered in the manner pointed out by the act, by actions at law, if the amount of compensation to be paid has not been ascertained by the appraisement of commissioners appointed as prescribed by the act.

This construction was placed on the company's charter by Chief-Justice Ewing, as early as 1830 (*Kough* v. *Darcey*, *6 Hal. 237*), and was emphatically endorsed in the judgment of the supreme court in *Den* v. *Morris Canal, 4 Zab. 587*. The case last cited is a precedent directly in point. It was an action of ejectment to recover lands occupied by the company for its canal, where no agreement for the use of the lands, and no legal assessment, payment or tender of the damages by the company had been made. The court held that upon the true construction of its charter, the company had authority to take and use the land, and construct their canal upon it, without any agreement with the owner therefor, or assessment and payment, or tender of damages, and that ejectment would not lie; that the company was not a wrong-doer in taking possession under such circumstances, and that the plaintiff's remedy was by action for compensation under the twentieth section of the charter, and not by ejecting the company from the premises.

The injury which McFarlan sustained by back-water, is one which the company was authorized by its charter to do, if it resulted from the construction of its canal, and for which the injured party's only redress is by action for damages. The depreciation or diminution in value of adjacent property, not actually occupied, caused by back-water, is a taking, within the meaning of an act of the legislature, of this character. *Glover* v. *Powell, 2 Stock. 211; Trenton Water Power Co.* v. *Raff, 7 Vr. 335.* The language of the charter leaves no doubt on this subject. The fifth section gives the company power to enter upon, take possession of, and use all and singular such lands, waters and streams, as may be necessary for the construction and use of its canal, subject to the compensation in the act directed. The twentieth section, which provides for the means of obtaining compensation, impliedly gives a right of action to the person injured, for damages to his or her water rights, as well as to his lands, tenements and hereditaments, arising from the construction of the canal; and the twenty-seventh section extends that remedy to damages sustained by the subsequent operations of the company, from time to time, as the same may arise. In construing the twentieth section, Chief-Justice Ewing, in *Kough* v. *Darcey*, remarks that " In the first place, this section embraces all persons who may sustain injury or suffer damage in lands, tenements, hereditaments and water rights, by the erection of the canal, in whatsoever mode such injury or damage may accrue, whether direct or indirect, immediate or consequential, whether by actual occupation, or by remote deterioration; in the second place it covers the same extent of damages, right and estate, which are provided for and which may be satisfied by or vested in the company, in virtue of the previous sections." The same views with regard to the company's rights under its charter, are expressed by Mr. Justice Elmer, in *Den* v. *Morris Canal, ubi supra.* Referring to the observation of Chief-Justice Ewing, above quoted, and speaking of the twentieth section

of the charter, he says : " It is, therefore, one of the modes
of compensation directed by the act, authority being thus
given to the company to take possession and use the requi-
site land, subject to being sued by the proprietor for such
damages as he thereby sustained, including the taking from
him his estate therein, unless he thought proper to agree
upon the proper compensation, or to await an assessment,
it follows as a necessary construction, that the taking and
using was meant to be absolute, and not subject to be
afterwards disturbed.  The taking and using subjected the
company to be called upon for compensation, at the option
of the proprietor, to the whole extent of the injury done to
his possession and estate, by means of a suit at law."    The
same learned judge, speaking on the subject of the rights
of the company under its charter, in lands appropriated to
its use in constructing its canal, says : " It being established
that the preliminary survey was sufficient, and that, by the
true construction of the charter, the company have author-
ity to take and use the land, that is, to construct their canal
upon it, before any agreement was made with the owner, or
any assessment or tender of the damages, subject to the
liability of being sued for the damages thus occasioned, I
think it follows, as a necessary implication, that the owner
cannot recover the possession by action of ejectment.  Such
an action is not an action for the recovery of damages,
within the meaning of the twentieth section.  It would be
absurd to suppose that the legislature meant to give the
company a right to take the land, and construct the canal
upon it, and, upon failure to obtain a valid assessment of
the damages, subject the whole work to be destroyed by
permitting a part of it to be taken from their possession,
and filled up or otherwise obstructed."

In the first of the cases cited, it was held that, in taking
property for the construction of its canal, the company
could not be regarded as a trespasser for the purposes of an
action by the injured party, for compensation.  In the other
case, it was considered that an entry on lands, without the

47

consent of the owner, or payment or tender of damages, did not make the company a trespasser for the purposes of an action of ejectment. In both cases, the taking and possession were regarded as lawful, and the only remedy for the injuries consequent thereupon, arising either from the actual occupation of lands, or from the injurious effects upon water rights, and whether the damages were direct or consequential, was by action.

Following these precedents, and guided by the true construction of the company's charter, it is manifest that these defendants cannot resort to the means of redress they sought to adopt. They claim a right to abate a private nuisance, by removing a portion of the company's dam. The foundation of the right to abate is, the unlawfulness of the structure complained of. That foundation does not exist. The charter of the company authorizes and legalizes the erection of works of the character complained of, and provides another mode of redress for private injuries, as the only means of relief. And it was competent for the legislature, at the time this charter was granted, to confer upon a corporation the powers and privileges granted to this company.

In the pleadings, the right of the complainants under their charter to erect this dam as it was constructed, is distinctly put in issue. The complainants, in their bill, set out the charter of the company, and the supplements thereto, and aver that " the said Morris Canal and Banking Company, under and by virtue of the power and authority conferred upon it by the said act of incorporation, and the several supplements thereto, was fully authorized and empowered to erect and maintain said dam for the purposes aforesaid."

The defendants, in their answers, insist that " the said Morris Canal and Banking Company never acquired any right, either by its said act of incorporation, or by any of the supplements, or amendments thereto, or in any other way, to dam said river at said point of intersection, for any

Lehigh Valley R. R. Co. v. McFarlan.

other purpose than simply that of floating the boats through said river; and that neither said complainant, the Morris Canal and Banking Company, nor the Lehigh Valley Railroad Company, ever acquired, in any manner whatever, as against any riparian proprietors, either above or below the said canal dam, the right to use said dam for the purpose of creating or maintaining a reservoir or feeder for the 'four-mile level' of said canal, and have never acquired any right, for any purpose, to back or dam the waters of said river upon the said tract of land of the defendant, Henry McFarlan, or to impede the natural flow of the waters in said river along said tract of land, or in said tail-race, and have no right whatever to dam said water, or to raise said canal dam higher than the top of the wooden sill or stringpiece of said canal dam."

The evidence taken for the final hearing, shows that the dam, with the addition of flash-boards above the substantial structure, is necessary to an adequate supply of water to the lower level, and indispensable to the operations of the canal. The proof shows that, without the flash-boards, the navigation of the canal by boats of the draught to which the canal, after its enlargement, was adapted, would be permanently stopped over that level, and that no less than seventy-three loaded boats were grounded on that level while this supply of water was cut off by the act of the defendants.

Considering the character of the complainants' rights, and the nature and extent of the injury, public and private, that will result from the proposed interference with a great public work, this is plainly a case requiring the interposition of chancery.

The decree appealed from should be reversed, and a perpetual injunction decreed in accordance with the prayer of the bill.

Decree unanimously reversed.